### STATE OF CONNECTICUT *v.* IBAN C.
### (SC 17389)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.

Argued May 16—officially released October 4, 2005

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Walter D. Flanagan*, state's attorney, and *Deborah Mabbett*, assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant appeals from the trial court's judgment of conviction, rendered after a jury trial, of two counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[1] The defendant claims that the trial court improperly: (1) admitted the opinion of an expert witness, via testimony and a written report, on the ultimate issue in the case; (2) questioned two witnesses in violation of the defendant's due process right to a fair trial before an impartial judge and jury; and (3) appointed a guardian ad litem for the victim for the purpose of compelling her to testify

---

[1] General Statutes § 53-21 (a) provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of a . . . class B felony . . . ."

General Statutes § 53a-65 (8) provides: " 'Intimate parts' means the genital area, groin, anus, inner thighs, buttocks or breasts."

against the wishes of her parents. We affirm in part and reverse in part the judgment of the trial court.

In connection with two separate incidents, the defendant, Iban C.,[2] was charged with one count of sexual assault in the first degree (count one) in violation of General Statutes § 53a-70 (a) (2),[3] one count of attempted sexual assault in the first degree (count two) in violation of General Statutes §§ 53a-49 (a) (2)[4] and 53a-70 (a) (2), and two counts of risk of injury to a child (counts three and four) in violation of § 53-21 (a) (2). Counts one, two and three of the information related to an alleged sexual assault of the victim by the defendant in the bathroom of his home (bathroom incident). Count four of the information related to an alleged sexual assault of the victim by the defendant in one of the bedrooms of his home (bedroom incident). The jury found the defendant guilty of risk of injury to a child under counts three and four of the information, and the trial court subsequently rendered judgment of conviction in accordance with the jury's verdict. This appeal followed.[5]

The jury reasonably could have found the following facts. The five year old victim, who was the niece and

---

[2] The last name of the defendant is omitted to protect the identity of the victim and in keeping with the spirit of General Statutes § 54-86e.

[3] General Statutes § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ."

[4] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[5] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

goddaughter of the defendant, lived next door to the defendant and often went to his home to play with his children. On two separate occasions, the defendant engaged in inappropriate conduct with the victim. On one occasion, in a bedroom of the defendant's home, the defendant kissed the victim on the mouth "like he kisses his wife" and rubbed his penis against the back of the victim's pants. On another occasion, in the bathroom of the defendant's home, he rubbed his penis against the victim's vagina and then urinated on the floor.[6]

The victim did not disclose either of these incidents until she and her mother were at a relative's house preparing for a New Year's Eve party. At the party, the victim's mother and other adults were playing a game in which a participant would receive $1 for telling the truth. The victim offered to tell the truth for $1 as well, at which point she disclosed that the defendant had "kissed her on the mouth" and had "come into the bathroom and [had] cleaned [her] with toilet paper."

The victim's mother subsequently telephoned the victim's pediatrician to obtain a referral to someone who could help determine if the victim was being truthful in her allegations against the defendant. The pediatrician referred the victim's mother to Veronica Ron-Priola, another pediatrician who worked in the same practice. She suggested that the mother contact the department of children and families (department) to report the abuse. Ron-Priola, worried that the victim's mother might not contact the department because she did not want to get the defendant in trouble, telephoned the department to report the abuse the next day.

Shortly after receiving the complaint from Ron-Priola, the department commenced an investigation into

---

[6] The state argued that the defendant had ejaculated on the floor of the bathroom after he had assaulted the victim.

the matter and called the police, who also notified the multidisciplinary investigation team (investigation team).[7] A member of the investigation team interviewed the victim in a "child friendly room" regarding her experience with the defendant. Detective Rachel Halas of the Danbury police department observed the interview through a one-way mirror. On the basis of that interview, the investigation team referred the victim to Ron-Priola for a physical examination. After performing that examination, Ron-Priola completed a written report indicating that the results of the physical examination were normal. Ron-Priola's report, however, contained a diagnosis of "[c]hild [s]exual [a]buse" based both on her physical examination and the victim's history developed by the investigation team.

After reviewing Ron-Priola's written report, Halas and Detective Julio Lopez of the Danbury police department met with the defendant at his home and invited him to come to the police station for a voluntary interview. During the interview at the station, the defendant acknowledged that he was aware of the fact that the victim had alleged that he had touched and kissed her in an inappropriate manner, but he initially denied any wrongdoing. The defendant continued to deny touching the victim in a sexual manner until Halas asked him if he would be willing to submit to a polygraph examination. At that point, the defendant's demeanor changed. He became very nervous, began sweating and asked several questions about the polygraph examination. Halas and Lopez eventually concluded, after additional questioning, that the defendant would be more willing to discuss what had happened between himself and the victim if a woman was not in the room. Halas excused

---

[7] The investigation team consists of a pediatrician, professionals from the department, the police department and the victim's advocate office. Its goal is to investigate allegations of sexual abuse in a manner that is least traumatic to the victim.

herself from the interview room, and Lopez continued talking to the defendant for approximately another twenty minutes. At the end of that conversation, the defendant confessed to having had inappropriate contact with the victim in one of the bedrooms of his home between June and July, 2002, and provided a written statement describing the incident.[8] Once the statement was completed, Lopez translated the entire statement into Spanish for the defendant's approval, and the defendant signed and swore to its accuracy under oath. The defendant was then permitted to leave the police station.

---

[8] Because the defendant was unable to read or write in English, Lopez prepared a written statement, recounting the defendant's description of the incident in the defendant's own words. Lopez also translated the statement into Spanish as he was drafting it so that the defendant could make corrections, if necessary. That statement provides as follows: "I make the following voluntary statement. I have been advised that any statement(s) made herein which I do not believe to be true, and which statement is intended to mislead a public servant in the performance of his/her official function, is a crime under [General Statutes §] 53a-157.

"I am talking to Detective Lopez of the Danbury Police Department regarding an incident which took place about 6 months ago. I gave Detective Lopez permission to write my statement in English because I cannot.

"At around 4 PM about six months ago I came home from work. Home at my apartment was my wife, 6 year old son, Christian, and my next door neighbors daughter, [the victim]. I went into my bathroom and took a shower. I was standing in the bathroom drying myself off when I saw [the victim] walk into the bedroom where she saw me naked. I put on a pair of underwear and walked out into the bedroom. [The victim] was still in the bedroom for some reason. I kissed [the victim] on the lips. I sat on the bed grabbed [the victim], and had her sit on my lap. I pulled the front of my underwear down and positioned [the victim] between my legs so my penis was rubbing the back of her pants. I did this for about 30 seconds. Suddenly I realized that I was doing something wrong and I put [the victim] down. I got up put my clothes on.

"I have never done something like that before and I don't know why I did it this time. I think maybe the devil got into me and made me do this. Since that day [I] haven't been alone with [the victim] and I have never touched her again. [Initialed] IC.

"By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief."

Rogerio Lima, an employee of the department, subsequently interviewed the defendant as part of its investigation into the victim's allegations. The defendant told Lima that one evening when he had gotten out of the shower, he saw the victim and put her in his lap while he was wearing only underwear. He then realized that he had been doing something wrong and put her back down. Lima asked the defendant to describe the incident in more detail and inquired as to whether the statement that the defendant gave to the police was accurate. Lima read the defendant's statement to him in Spanish once again, and the defendant confirmed that it was an accurate statement of the incident. The police arrested the defendant later that day.

The jury found the defendant guilty of risk of injury to a child with respect to both the bathroom incident and the bedroom incident. The court sentenced the defendant to ten years imprisonment, plus two years special parole, for a total effective sentence of twelve years on each count, to run concurrently.[9] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

EXPERT OPINION

We first address the defendant's claim that the trial court improperly admitted the opinion of an expert witness, via testimony and a written report, on the ultimate issue in the case. Specifically, the defendant contends that Ron-Priola's testimony and written report

The statement was signed by the defendant and also signed by Detective Lopez.

[9] Because we are reversing the defendant's conviction on count three of the information and ordering a new trial on that count, and affirming his conviction on count four of the information, if, following our remand, he is acquitted on count three, he will be entitled to be resentenced on count four. See State v. Miranda, 260 Conn. 93, 129–30, 794 A.2d 506, cert. denied, 537 U.S. 902, 123 S. Ct. 224, 154 L. Ed. 2d 175 (2002).

stating her diagnosis of "[c]hild [s]exual [a]buse" invaded the province of the jury by giving an opinion that embraced the ultimate issue in the case, where the trier of fact did not need expert assistance in deciding that issue, and endorsed the credibility of the victim. We agree. We also conclude that the trial court's error was harmful with respect to the conviction pertaining to the bathroom incident. With respect to the jury's conviction of the defendant pertaining to the bedroom incident, however, we conclude that the error was harmless.

The following additional facts and procedural history are relevant to this claim. Prior to trial, the defendant moved to preclude expert medical testimony from Ron-Priola as to whether the victim had been sexually abused because that question was one of the facts that must be decided by the jury. The defendant argued that a central contention of his case was that the alleged sexual abuse of the victim had never taken place; therefore, it was up to the jury to determine whether the victim had been sexually abused, rather than for Ron-Priola to offer a conclusory opinion as to that fact. The state made an offer of proof that Ron-Priola's "testimony would include 'symptoms or signs of the sexual abuse.' " The trial court denied the defendant's motion. The court ruled that Ron-Priola was permitted to testify about the "results of her examination, what signs or symptoms she saw and whether that's consistent with sexual abuse," and that she could testify consistently with the state's offer of proof.

At trial, the state called Ron-Priola as its last witness. During her testimony, she stated that, "because the mucus in the genital area heals very quick[ly]," the majority of the examinations of children who have been sexually abused yield normal results. On cross-examination, Ron-Priola acknowledged that such a result was also consistent with a child who had not been sexually

abused. She based her diagnosis, however, on the concerns expressed and allegations made by the victim's mother at the time of the physical examination, and on the interview of the victim conducted by the investigation team. Specifically, Ron-Priola stated: "Based on the history that the child gave me—I'm sorry, that the mother gave me and that the child gave to the [investigation team], it is consistent with child sexual abuse, even though the physical examination was normal." As noted at oral argument before this court, the defendant does not find fault with this portion of Ron-Priola's testimony.

Rather, the defendant objects to the admission of Ron-Priola's unredacted written report, despite a timely objection by the defendant, and to her subsequent testimony in which she stated that "child sexual abuse" had occurred in this particular case. The defendant contends that these two pieces of evidence constituted an expert opinion concerning the ultimate issue in the case, without assisting the jury in deciding the specific issue it needed to concentrate on in its deliberations, and improperly endorsed the credibility of the victim's testimony. In particular, the defendant notes that Ron-Priola's report from her physical examination of the victim contains a written diagnosis of "[c]hild [s]exual [a]buse." Furthermore, during direct examination, following admission of that written report as an exhibit, and in response to questions regarding the basis of her diagnosis, Ron-Priola stated: "Yes, by the tests or the history, that's how I came up with my diagnosis of sexual abuse." Similarly, on cross-examination by the defendant, Ron-Priola stated: "As I said before, I do not base my diagnosis on the physical exam. If the physical exam is normal, but I have a history that is consistent with sexual abuse, *my diagnosis is sexual abuse.*" (Emphasis added.)

We first "set forth the standard by which we review the trial court's determinations concerning the [admissibility] of evidence. The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 392, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002). "The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions." (Internal quotation marks omitted.) *State* v. *Spigarolo*, 210 Conn. 359, 376, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989). "The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986). Generally, expert testimony is admissible if "(1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Vega*, supra, 392.

"The determination of the credibility of a witness is solely the function of the jury." (Internal quotation marks omitted.) *State* v. *Smith*, 200 Conn. 544, 550, 512 A.2d 884 (1986). "It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony." *State* v. *Carter*, 196 Conn. 36, 45, 490 A.2d 1000 (1985). Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims. See *State* v. *Freeney*, 228 Conn. 582, 592, 637 A.2d 1088 (1994). "An expert witness ordinarily may not express an opinion on an ultimate issue of fact, which must be decided by the

trier of fact. . . . Experts can [however,] sometimes give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass." (Citation omitted; internal quotation marks omitted.) *State* v. *Vilalastra*, 207 Conn. 35, 41, 540 A.2d 42 (1988); see also Conn. Code Evid. § 7-3.

Additionally, in cases that involve allegations of sexual abuse of children, we have held that expert testimony of reactions and behaviors common to victims of sexual abuse is admissible. See *State* v. *Spigarolo*, supra, 210 Conn. 380. Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. Id., 378. It is not permissible, however, for an expert to testify as to his opinion of whether a victim in a particular case is credible or whether a particular victim's claims are truthful. Id., 379; see also *State* v. *Butler*, 36 Conn. App. 525, 530–31, 651 A.2d 1306 (1995); *In re Noel M.*, 23 Conn. App. 410, 423, 580 A.2d 996 (1990). In this regard, we have found expert testimony stating that a victim's behavior was generally *consistent with* that of a victim of sexual or physical abuse to be admissible, and have distinguished such statements from expert testimony providing an *opinion as to whether a particular victim had in fact* suffered sexual abuse. See *State* v. *Freeney*, supra, 228 Conn. 592–93 (court admitted expert testimony regarding consistency of victim's behavior stating that "neither expert gave an opinion as to whether this particular victim had . . . in fact suffered physical or sexual abuse").

Moreover, we have noted that even indirect assertions by an expert witness regarding the ultimate issue in a case can serve inappropriately to validate the truthfulness of a victim's testimony. See *State* v. *Grenier*, 257 Conn. 797, 806, 778 A.2d 159 (2001). Finally, in cases

in which an expert witness reaches a conclusion on the ultimate issue in part based upon statements made by the victim, we note that Connecticut case law has previously recognized the general rule of law that the expert is necessarily making a determination about the victim's credibility. See *State* v. *Apostle*, 8 Conn. App. 216, 232–33, 512 A.2d 947 (1986) (court concluded that physician's opinion that intercourse was nonconsensual was inadmissible because it went beyond his physical examination and was based on victim's description of incident). Such credibility determinations are more properly within the sole province of the jury. See *State* v. *Smith*, supra, 200 Conn. 550.

In the present case, we conclude that the trial court abused its discretion by admitting into evidence Ron-Priola's diagnosis of "[c]hild [s]exual [a]buse" via her unredacted written report and her direct testimony. First, because Ron-Priola did not find any physical evidence of a sexual assault, in order for the jury to find the defendant guilty of counts three and four of the information, it had to find the victim's account of both the bedroom and the bathroom incidents to be credible. In short, the victim's credibility was central to the state's case. Indeed, by Ron-Priola's own admission, her diagnosis depended on a belief in this same credibility because her ultimate assessment was based almost entirely on the history provided by the victim and the victim's mother to the investigation team. Ron-Priola's diagnosis of child sexual abuse, therefore, necessarily endorsed the victim's credibility, and functioned as an opinion as to whether the victim's claims were truthful. Additionally, Ron-Priola's report and statements were not limited to the conclusion that the physical evidence and the victim's behavior were consistent with that of other victims of sexual abuse. Rather, they provided the jury with an opinion that the victim had suffered sexual abuse in the present case. Ultimately, evaluating

the victim's credibility and determining whether child sexual abuse occurred were tasks for the jury, not Ron-Priola as an expert witness.

This case is similar to *State* v. *Grenier*, supra, 257 Conn. 806. In *Grenier*, one of the state's testifying experts stated that her treatment of the victim was for "the trauma of the abuse that [she] experienced." (Internal quotation marks omitted.) Id. We concluded that the trial court had abused its discretion by not striking that statement, and that "although [the expert's] testimony was not a literal statement of [her] belief in [the victim's] truthfulness, such testimony had the same substantive import and could be perceived as a conclusive opinion that [the victim] had testified truthfully." (Internal quotation marks omitted.) Id. Similarly, in the present case Ron-Priola's written report containing a diagnosis of "[c]hild [s]exual [a]buse" and her testimony affirmatively stating that same diagnosis, constituted an indirect assertion as to the truthfulness of the victim's testimony. In light of Ron-Priola's extensive qualifications in the field of child sexual abuse, it is reasonable to presume that the jurors would likely conclude that the evidence stating her diagnosis in this particular case served to validate the victim's testimony. As we noted in *Grenier*, such evidence easily could "be perceived as a conclusive opinion that [the victim] had testified truthfully." (Internal quotation marks omitted.) Id., 806.

Second, despite the state's claim to the contrary, the challenged evidence was not helpful to the jury in deciding the precise question on which it had to pass.[10] Sec-

---

[10] The state also suggests in its brief that Ron-Priola never actually testified as to the ultimate issue in the case because the ultimate issue was not simply whether the victim was abused, but whether the defendant was the abuser. This claim is without merit. The subject of the perpetrator's identity was never at issue in the present case. The victim gave repeated accounts of sexual abuse at the hands of the defendant. At trial, the defendant never argued that someone else was the perpetrator of sexual abuse against the victim. Rather, he attacked the victim's recollection of the incident, pointed to the lack of physical evidence of a sexual assault, and introduced several

tion 7-3 (a) of the Connecticut Code of Evidence provides in relevant part that "an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue." The state argues that, to the extent Ron-Priola offered an opinion on the ultimate issue in this case, such an opinion was appropriate because it assisted jurors in understanding how a lack of injury to the genital area bears on the issue of sexual abuse of a child. In this regard, the state contends that *State* v. *Whitley*, 53 Conn. App. 414, 730 A.2d 1212 (1999), is persuasive. We disagree.

We conclude that *Whitley* is inapposite to the present case. In *Whitley*, the defendant was charged with sexually abusing a child, and the state presented two expert witnesses who testified that a lack of physical injury can be consistent with sexual abuse. Id., 421. The defendant claimed that such testimony amounted to an improper opinion on the ultimate issue in the case, namely, whether the child victim had been sexually abused. Id. The Appellate Court disagreed, noting that "the existence or absence of physical injury to a victim's genital or anal area and its relation to a sexual assault is not necessarily an obvious matter within the common knowledge of the average person. . . . [That court concluded], therefore, that the trial court did not abuse its discretion in allowing the state's experts to testify about the consistency of a lack of physical injury with assault." Id., 422. Unlike in the present case, in *Whitley*, the expert witness testimony at issue did not contain a definitive diagnosis of child sexual abuse. Instead, the expert testimony in *Whitley* merely stated that the vic-

---

alternative explanations for the victim's change in behavior, namely, anger over the defendant disciplining her at his home, ideas learned from watching adult soap operas, and uncertainty over starting kindergarten. Consequently, the ultimate issue in the present case was whether the victim had been sexually abused.

tim's injury was *consistent* with sexual abuse. We have never stated that such expert testimony is inadmissible. In the present case, by contrast, Ron-Priola's testimony and her written report stating a diagnosis of sexual abuse, effectively offered an expert opinion that this particular victim had *in fact* suffered sexual abuse.

When viewed in isolation, Ron-Priola's diagnosis of "[c]hild [s]exual [a]buse" did not provide any assistance to the jury in understanding the facts presented at trial or the issue on which it needed to deliberate. To find the defendant guilty of risk of injury to a child, the jury had to find that the defendant "ha[d] contact with the intimate parts . . . of a child . . . in a sexual and indecent manner likely to impair the health or morals of such child . . . ." General Statutes § 53-21 (a) (2). In light of the case history and the victim's testimony offered into evidence at trial, this type of assessment was well within the jurors' capabilities and understanding, and did not require a separate conclusion from Ron-Priola that sexual abuse had taken place. It is well recognized that testimony on matters which are not beyond the ken of the average juror does not qualify as admissible expert testimony. See *State* v. *George*, 194 Conn. 361, 373, 481 A.2d 1068, cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985). When inferences or conclusions are so obvious that they could be as easily drawn by the jury as the expert from the evidence, expert testimony regarding such inferences is inadmissible. See id.

Finally, the state argues that the admission into evidence of Ron-Priola's diagnosis of "[c]hild [s]exual [a]buse" must be examined in the context in which it was offered. Specifically, the state notes that Ron-Priola's diagnosis was elicited in the context of explaining how lack of an injury to the genital area can be consistent with the sexual abuse of a child, which was an appropriate area of inquiry. As we noted in *State*

v. *Grenier*, supra, 257 Conn. 810 n.15, however, "[w]e disagree . . . that the form of [the] questions has any substantial bearing on the extent or degree of the prejudice that flowed from the answers. Our resolution of the defendant's claim does not depend on the precise context in which the improper testimony was given, but, rather, the substance of that testimony." Ron-Priola's written diagnosis of "[c]hild [s]exual [a]buse," and subsequent testimony to that effect, constituted inadmissible opinion evidence regarding the credibility of the victim and was not helpful to the jury in deciding the issue.

Our conclusion that the trial court abused its discretion in admitting the improper evidence does not, however, end our inquiry. The remaining question is whether the admission of Ron-Priola's expert testimony and medical report detailing her diagnosis of "[c]hild [s]exual [a]buse" was harmful. "When a trial error in a criminal case does not involve a constitutional violation the burden is on the defendant to demonstrate the harmfulness of the court's error." (Internal quotation marks omitted.) *State* v. *Vilalastra*, supra, 207 Conn. 47. A claim that the trial court improperly admitted the testimony of an expert is an "evidentiary impropriety [and] not constitutional in nature . . . [thus] the defendant bears the burden of demonstrating harm." *State* v. *Grenier*, supra, 257 Conn. 806–807. "As we recently have noted, we have not been fully consistent in our articulation of the standard for establishing harm. . . . One line of cases states that the defendant must establish that it is more probable than not that the erroneous action of the court affected the result. . . . A second line of cases indicates that the defendant must show that the prejudice resulting from the impropriety was so substantial as to undermine confidence in the fairness of the verdict." (Internal quotation marks omitted.) *State* v. *Merriam*, 264 Conn. 617, 667, 835 A.2d 895

(2003). For purposes of the present case, we need not chose between the two formulations or determine whether there is a functional difference between them. Applying either formulation of the test, we conclude that the defendant has met his burden of demonstrating harm with respect to his risk of injury to a child conviction under count three of the information concerning the bathroom incident. Conversely, applying either formulation of the standard, we conclude that the defendant has failed to meet his burden of demonstrating harm with respect to his conviction of risk of injury to a child under count four of the information concerning the bedroom incident.

A

Harmful Error Regarding Count Three

First, with respect to the defendant's conviction of risk of injury to a child for the bathroom incident, the state's case rested almost entirely on the victim's credibility. The state did not introduce any physical or medical evidence of abuse and did not present any eyewitness testimony other than that of the victim. The state's case surrounding the details of the alleged abuse centered on the victim's testimony, the constancy of accusation testimony of the victim's mother and aunt, and the testimony of Ron-Priola regarding her physical examination and ultimate diagnosis of the victim. There was also evidence that, around the time of the abuse, the victim's behavior changed at school and at home. Furthermore, the defendant's confessions to the police and the department pertained only to the bedroom incident, and did not include any admissions of inappropriate conduct as part of a separate bathroom incident as charged in count three of the information. Moreover, the defendant testified at trial and denied both of the victim's claims of abuse. Consequently, with respect to the bathroom incident, the state's only properly admit-

ted substantive evidence was essentially the testimony of the five year old victim, whose credibility was central to the state's case, and the evidence of the child's behavior.

Ron-Priola's diagnosis of "[c]hild [s]exual [a]buse," therefore, bolstered the credibility of the victim relative to that of the defendant. Ron-Priola's qualifications are extensive,[11] and she was qualified as an expert in the field of child sexual abuse without objection. In light of Ron-Priola's expertise, and in view of the fact that the victim's statements provided the only evidence of the defendant's guilt, it is reasonable to presume that the jurors would conclude that, if Ron-Priola believed the victim's allegations enough to reach a diagnosis of "[c]hild [s]exual [a]buse," then they should as well. See *State* v. *Grenier*, supra, 257 Conn. 809. Although there was also evidence of the child's behavioral change, that evidence was not tied to either specific incident and was, therefore, explainable as deriving from either. Thus, in our view, it was insufficiently corroborative of the bathroom incident to overcome the more weighty effect that Ron-Priola's impermissible opinion likely had on the jury's verdict.

The state makes four arguments in support of its position that any error by the trial court was harmless. First, the state contends that the most damaging evidence against the defendant was his own confession, not Ron-Priola's diagnosis of "[c]hild [s]exual [a]buse." This argument is without merit with respect to the

---

[11] Ron-Priola testified at some length as to her background and qualifications in the field of child sexual abuse. Specifically, she testified that she was the medical director for the Pediatric Health Center in Danbury and that she had specialized in treating young children for over fifteen years. She also stated that she was a medical consultant for the investigation team of the greater Danbury area, that she had received training in the field of child sexual abuse from the leading practitioners in Connecticut, and that she had served as an expert in child sexual abuse for the medical examiners office for the state of Connecticut.

defendant's conviction under count three of the information. As previously noted, the defendant's confession was applicable only to the bedroom incident, or count four of the information, and had nothing to do with the bathroom incident described by the victim at trial. Indeed, rather than confessing to the bathroom incident, the defendant repeatedly denied ever having been in the bathroom with the victim and touching her in an inappropriate manner.

Second, the state contends that Ron-Priola's testimony was brief and ambivalent in nature, and acknowledged that the victim's lack of physical injury was consistent with both sexual abuse and a lack of sexual abuse. Citing *State* v. *Whitley*, supra, 53 Conn. App. 423, the state argues that, because Ron-Priola's evidence could be interpreted as either favorable or unfavorable to the defendant, the testimony was not necessarily prejudicial. We disagree. Contrary to Ron-Priola's testimony regarding her physical examination, her diagnosis was not ambivalent in nature and could not be interpreted either favorably or unfavorably to the defendant. Quite the opposite, by opining that the victim had been sexually abused, Ron-Priola's diagnosis was definitive and conclusory in nature, and thus encouraged the jury to favor the victim's story over that of the defendant.

Third, the state contends that the trial court's curative instruction issued during its jury charge mitigated any danger that the jury would place undue weight on Ron-Priola's written report and the testimony surrounding her diagnosis. As we noted in *State* v. *Grenier*, supra, 257 Conn. 810, in which the state raised the identical argument under very similar facts, "[w]e acknowledge that, as a general matter, the jury is presumed to follow the court's curative instructions in the absence of some indication to the contrary." In the present case, however, the court did not give a curative instruction immediately following the admission of the written report

and the improper testimony. Instead, the court, in the presence of the jury, overruled the defendant's objection to the admission of the unredacted written report into evidence, and heard arguments, outside the presence of the jury, regarding the defendant's motion in limine to exclude testimony from Ron-Priola regarding her diagnosis. Furthermore, the jury instruction eventually given by the trial court at the close of evidence simply permitted the jury to accept or reject Ron-Priola's opinion and did not instruct the jury to disregard her diagnosis of "[c]hild [s]exual [a]buse."[12]

Finally, the state claims that any error associated with admitting the improper evidence was harmless because the defendant was acquitted of the more serious charges of first degree sexual assault, thus suggesting that the jurors were not overly influenced by

[12] On the subject of expert witnesses, the trial court charged the jury as follows:

"Now, we've had, in this case, testimony from expert witnesses. Expert witnesses are people who, because of their training, education, and experience, have knowledge beyond that of the ordinary person. Because of that expertise, in whatever field they happen to be in, expert witnesses are allowed to give their opinions. . . .

"The experts, in this case, have given opinions. However, the fact that these witnesses may qualify as experts does not mean that you have to accept their opinions. You can accept their opinions or reject them.

"In making your decision whether to believe an expert's opinion you should consider the expert's education, training, and experience in the particular field; the information available to the expert, including the facts the expert had and the documents or other physical evidence available to the expert; the expert's opportunity and ability to examine those things; the expert's ability to recollect the activity and facts that form the basis for the opinion; and the expert's ability to tell you, accurately, about the fact, activity, and the basis for the opinion. . . . You should further consider whether the opinions stated by the expert have a rational and reasonable basis in the evidence.

"Based on all of those things, together with your general observation and assessment of the witness, it is then up to you to decide whether or not to accept the opinion. You may believe all, some, or none of the testimony of an expert witness. In other words, an expert's testimony is subject to your review like that of any other witness."

Ron-Priola's testimony and had carefully weighed all of the evidence in arriving at a verdict. This claim is similarly without merit. The primary difference between the crimes of sexual assault in the first degree and risk of injury to a child is the act of "sexual intercourse," or penetration of the victim's vagina. We conclude that, merely because the jury did not find, beyond a reasonable doubt, that the defendant had penetrated the victim's vagina as part of the two sexual assaults, does not establish that the jury failed to be influenced by Ron-Priola's diagnosis of "[c]hild [s]exual [a]buse" in reaching guilty verdicts on the risk of injury counts. At a minimum, Ron-Priola's diagnosis endorsed and provided credibility to the victim's claim that some type of inappropriate contact had taken place between the victim and the defendant in the bathroom and bedroom of his home.

B

Harmless Error Regarding Count Four

With respect to the risk of injury to a child charge concerning the bedroom incident, the victim's credibility was not nearly as central to the state's ability to obtain a conviction. In contrast to the bathroom incident, the evidence admitted at trial in support of count four of the information included two separate confessions by the defendant. We have repeatedly noted that a confession, "if sufficiently corroborated, is the most damaging evidence of guilt . . . and in the usual case will constitute the overwhelming evidence necessary to render harmless any errors at trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 596, 849 A.2d 626 (2004); see also *Milton* v. *Wainwright*, 407 U.S. 371, 372, 92 S. Ct. 2174, 33 L. Ed. 2d 1 (1972); *State* v. *Shifflett*, 199 Conn. 718, 752, 508 A.2d 748 (1986). The defendant admitted to police that he brought the victim into a bedroom, positioned her on his lap and

rubbed his penis on the back of her pants.[13] In light of the victim's age, this admission satisfied all of the elements of the crime of risk of injury to a child charged in count four of the information.

Furthermore, the defendant's confession to police was corroborated by several other pieces of evidence entered at trial. Most importantly, the defendant confessed a second time as part of his department interview, reread his statement to the police and confirmed that it was an accurate statement of his conduct with the victim. The defendant's confession was also corroborated by Detective Lopez, who testified that the defendant reviewed and understood the statement before swearing to its accuracy. Corroboration of the defendant's confession was also derived from the victim's account of a sexual assault in the bedroom of the defendant's home, as well as the fact that the victim's behavior changed at school and home around the time of the abuse.

II

QUESTIONING BY THE TRIAL COURT

We next address the defendant's claim that his due process right to a fair trial was violated by the trial

---

[13] The defendant testified that he had lied to the police and to the department about taking the victim into one of the bedrooms of his home, kissing her on the mouth and rubbing his penis against her buttocks because the police told him that if he did not agree to confess to sexually abusing the victim, the department would take away his children. The defendant also stated that he confessed to police as part of his voluntary interview because they told him that if he confessed he would only have to pay a $1500 fine and "come in a couple of times to court [and] the case would be over." This reversal in the defendant's position does not reduce the significance of the defendant's multiple confessions to our harmless error analysis. As we have previously noted, "[t]he fact that the defendant contests the circumstances surrounding [his] statement and the [police department's] truthfulness in relation to it, does not, in and of itself, render his confession devoid of evidentiary value." State v. Stevenson, supra, 269 Conn. 596. In this regard, the defendant was unable to introduce any evidence, other than his unsupported allegations, that either the police or the department had threatened

court's questioning of two witnesses. The defendant contends that by virtue of that questioning, the trial court failed to maintain the appearance of impartiality by acting as an advocate for the state. The defendant failed to object to the trial court's examination of the witnesses and, therefore, seeks to prevail on his claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[14] We conclude that he cannot prevail on that claim because he has failed to establish that the alleged constitutional violation exists.

The following additional facts are necessary for a resolution of this claim. As part of the victim's testimony, the trial judge questioned the victim on two separate occasions. First, with respect to the victim's allegation that the defendant had touched her vagina[15] with his penis, the court interjected as follows:

"The Court: Would you clarify your question? You said, 'How many times did this happen?' How many times did what happen?

"[Assistant State's Attorney]: How many times did [the defendant] bother you?

"[The Victim]: Three times.

"[Assistant State's Attorney]: Okay.

---

to take his children away if he did not admit to abusing the victim, or that his confession had been unduly influenced by Detectives Halas or Lopez.

[14] In *Golding*, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[15] During the course of her testimony the victim referred to both the defendant's penis and her vagina as a "tortola."

"The Court: . . . [W]hen you say [the defendant] bothered you three times, do you mean that he used his tortola to clean your tortola three times? Is that what you mean?

"[The Victim]: Yes.

"The Court: All right. Could you pick up that doll with the dress on—No, the other one—and point to what you call your tortola. Where would it be on that doll?

"(The [victim] pointed.)

"The Court: Okay. Point—Hold it up, please.

"(The [victim] pointed.)

"The Court: She's pointing to the area of the vagina on the doll. Proceed. Okay."

Second, after both parties had examined the victim, the trial court engaged in the following colloquy with her in an effort to clarify the specific manner in which the victim testified that the defendant had touched her:

"The Court: You said that [the defendant] cleaned his tortola with your tortola? Is that what you said?

"[The Victim]: Yes.

"The Court: Okay. Could you tell me what you mean by that.

"[The Victim]: Yes.

"The Court: Okay. Please tell me.

"[The Victim]: That mean that's not very good, when hombres do that for the girls.

"[The Interpreter]: It's not very good when men do that with girls.

"The Court: Okay. Did part of his body touch your tortola?

"[The Victim]: Yes. Yes, almost.

"The Court: Almost?

"[The Victim]: Yes, almost. But it didn't not.

"The Court: Tell me where his—Show me on the doll where his tortola touched your tortola.

"[The Victim]: Right here, inside tortola.

"(The [victim] demonstrated.)

"[The Victim]: And now—Now—Then his tortola right here now.

"(The [victim] demonstrated.)

"[The Victim]: And then—

"The Court: Okay.

"[The Victim]: And now that's him. Now here's his tortola.

"(The [victim] demonstrated.)

"The Court: Okay.

"[The Victim]: Now mine is right here.

"(The [victim] demonstrated.)

"The Court: Okay. You're pointing—She's pointing to the vagina. Are you saying that his tortola, which is this part, the penis—

"(The court demonstrated.)

"The Court:—are you saying that it touched your tortola, which you pointed to, and—Is that what you're saying?

"[The Victim]: Yes.

"The Court: Did it go inside?

"[The Victim]: Yes."

The state's next witness was the victim's mother, who was called as a constancy of accusation witness. After both parties concluded their examination of the witness, the court engaged in the following colloquy with her:

"The Court: Ma'am, is it your testimony that [the victim] told you about a sexual encounter between herself and [the defendant], is that what you're saying?

"[The Victim's Mother]: Yes.

"The Court: And that's apart from the kiss that you mentioned?

"[The Victim's Mother]: No, no. No, that day that when she told me. I was with my siblings. That was the first time that she told me. And then afterward was when she told me all the rest of it.

"The Court: Well, I'm trying to understand what you're indicating. Are you saying that [the victim] told you about this kiss that you mentioned?

"[The Victim's Mother]: Yes. And—

"The Court: Wait a minute. And are you also saying she told you about some other sexual contact—or some sexual contact?

"[The Victim's Mother]: No, but not that same time.

"The Court: I'm not saying when she—when she told you. I'm saying, did she tell you about some sexual contact and that was a separate thing she told you from what she told you about the kiss?

"[The Victim's Mother]: Yes."

Neither party objected to the trial court's questioning of the victim or her mother during the course of direct examination. Additionally, in its instructions to the jury at the close of evidence, the trial court stated: "Now,

my actions during the trial, in ruling on motions or objections by counsel, or in comments to counsel, *or in questions to witnesses*, or in setting forth the law in these instructions, are not to be taken by you as any indication of my opinion as to how you should determine the issues of fact. The defendant justly relies upon you to consider carefully all of the evidence, and to find him not guilty if the facts and the law require such a verdict. The defendant rightfully expects fair and just treatment at your hands." (Emphasis added.)

Well established principles regarding the responsibilities of the trial judge in conducting a criminal trial guide our resolution of the defendant's claim. "Due process requires that a criminal defendant be given a fair trial before an impartial judge and an unprejudiced jury in an atmosphere of judicial calm. . . . In a criminal trial, the judge is more than a mere moderator of the proceedings. It is [the trial judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding. . . . Consistent with his [or her] neutral role, the trial judge is free to question witnesses or otherwise intervene in a case in an effort to clarify testimony and assist the jury in understanding the evidence so long as [the trial judge] does not appear partisan in doing so. . . . Thus, when it clearly appears to the judge that for one reason or another the case is not being presented intelligibly to the jury, the judge is not required to remain silent. On the contrary, the judge may, by questions to a witness, elicit relevant and important facts." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 272 Conn. 515, 535–36, 864 A.2d 847 (2005).

"One of the chief roles of the trial judge is to see that there is no misunderstanding of a [witness'] testimony. . . . A trial judge can do this in a fair and unbiased way . . . [and his] attempt to do so should not be a

basis of error." (Internal quotation marks omitted.) Id., 536. "Whether or not the trial judge shall question a witness is within his sound discretion . . . [and] [i]ts exercise will not be reviewed unless he has acted unreasonably, or, as it is more often expressed, abused his discretion." (Internal quotation marks omitted.) *State* v. *Bember*, 183 Conn. 394, 401, 439 A.2d 387 (1981). "The trial judge can question witnesses both on direct and cross-examination. . . . [I]t may be necessary to do so to clarify testimony as [the judge] has a duty to comprehend what a witness says . . . [and] to see that the witness communicates with the jury in an intelligible manner. . . . While no precise theorem can be laid down, we have held that it is proper for a trial court to question a witness in endeavoring, without harm to the parties, to bring the facts out more clearly and to ascertain the truth . . . and [intervene] where the witness is embarrassed, has a language problem or may not understand a question." (Internal quotation marks omitted.) *State* v. *Velasco*, 253 Conn. 210, 238, 751 A.2d 800 (2000); *State* v. *Fernandez*, 198 Conn. 1, 12–13, 501 A.2d 1195 (1985). "Whe[n] the testimony is confusing or not altogether clear the alleged jeopardy to one side caused by the clarification of a [witness'] statement is certainly outweighed by the desirability of factual understanding. The trial judge should strive toward verdicts of fact rather than verdicts of confusion." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 272 Conn. 536.

With the standards previously set forth as a guide, we conclude that the trial court did not abuse its discretion by briefly questioning the victim at trial. After a thorough review of the record, we agree with the state that, at times, the victim's testimony was confusing and difficult to follow.[16] Indeed, defense counsel went so far

---

[16] For example, when asked to describe the bathroom incident, the victim used slang to describe both her and the defendant's genitals and relied heavily on the use of dolls to demonstrate her recollection of the actual act

as to acknowledge this reality during closing arguments when counsel observed: "I found it difficult to follow much of what [the victim] said. At some points she seemed to say no part of [the defendant's] body ever touched hers, at other points she said he cleaned her private part with his private part after she peed." In particular, the victim's testimony was vague and unclear regarding the details of the alleged sexual abuse. Moreover, the victim's use of the term "tortola" to describe both her and the defendant's genitals created confusion and required repeated demonstrations using anatomically correct dolls in an attempt to clarify her allegations. Additionally, at the time of trial, the victim was still learning English and required the assistance of a Spanish interpreter. At times, her responses were disjointed and even appeared to answer a different question than the one posed by counsel.

Similarly, the trial court also did not abuse its discretion in questioning the victim's mother. The purpose of the mother's testimony was to serve as a constancy of accusation witness in order to verify that the victim initially reported two allegations of sexual abuse at the hands of the defendant. Due at least in part to similar language barriers, the mother's testimony was unclear as to whether the victim only described an incident where the defendant kissed her on the mouth, or whether she also reported a second incident of sexual

of the defendant touching her in an inappropriate manner. She also made the following statements in response to questions about what she did when the defendant entered the bathroom and tried to touch her: (1) "So I did, and I closed my eyes so I can see it but I—I'm supposed to close my eyes so I cannot see it. And that's when the—Well, that's what the people's not supposed to do with the girls"; and (2) "I was laying—I was going to—I was getting my shirt off, my pants off. Then he cleaned with that tortola, [the defendant]." The state later asked the victim whether the defendant abused her twice, once as part of the bedroom incident and once as part of the bathroom incident. The victim replied, "No, just one times. The now one and then that once."

abuse. The trial court's questioning sought to clarify this discrete issue and was quite brief within the context of the mother's overall testimony, amounting to only five questions in total. See *State* v. *Lopes*, 78 Conn. App. 264, 277–78, 826 A.2d 1238 (no abuse of trial court's discretion where court's questioning was not extensive), cert. denied, 266 Conn. 902, 826 A.2d 1238 (2003). Accordingly, we conclude that the trial court's questioning did no more than clarify confusing testimony from the victim and her mother, or, alternatively, facilitate the witnesses' more complete understanding of a question. We find nothing improper in these actions of the trial court. See *State* v. *Robertson*, 254 Conn. 739, 772, 760 A.2d 82 (2000) ("[a court's] attempts to facilitate a witness' understanding of a question are not improper . . . [and fulfill] its function of ensuring that the witness answered the state's question" [citation omitted]); *State* v. *Mack*, 197 Conn. 629, 641, 500 A.2d 1303 (1985) ("[a court's] comments or questions for the purpose of clarifying . . . testimony are permissible and often necessary").

The defendant contends that neither the testimony of the victim nor her mother needed clarification and that the trial court's questions demonstrated partisanship in favor of the state's case. We disagree. As we have recently noted, "[u]nlike an appellate court, the trial court is able to observe the testimony of witnesses firsthand and, therefore, is better able to assess the relative clarity—or lack thereof—of any particular testimony." *State* v. *Gonzalez*, supra, 272 Conn. 536. On the basis of the printed record alone, we cannot say that the testimony of the victim and her mother "was so clear and straightforward that the trial court's questioning of [them] was wholly unnecessary or inappropriate." Id. Quite the contrary, the printed record suggests that portions of both the victim's and her mother's testimony

were a source of confusion for all of the participants at trial.

With respect to the issue of partisanship, the defendant points to the fact that the trial court's questions attempted to confirm and establish the elements of the charged crimes. Additionally, the defendant claims that the trial court's questions prompted responses from the victim and her mother that were largely repetitive regarding the type of sexual activity alleged to have taken place, thus serving to bolster the credibility of the victim. Both of these contentions are without merit. "[T]he court's questioning of a witness is not necessarily improper [merely] because it draws attention to the strengths or weaknesses of a party's case." (Internal quotation marks omitted.) Id., 537; *State* v. *Smith,* supra, 200 Conn. 550. "The court must refrain, however, from making improper remarks which are indicative of favor or condemnation, or which disparage a defendant before the jury." *State* v. *Echols,* 170 Conn. 11, 14, 364 A.2d 225 (1975). Additionally, we have held that questions and answers that essentially consisted of restatements of a witness' testimony were properly viewed as clarifying in nature, and not an attempt to inappropriately bolster the credibility of the witness. See *State* v. *Gonzalez,* supra, 272 Conn. 537.

In the present case, none of the questions posed by the trial court contained a suggestion of advocacy, disparaged the defendant, or suggested that the trial court considered the witnesses' clarified testimony to be truthful. Specifically, "[t]he judge took no position of advocacy regarding the outcome of the case, and made no improper comments on the significance of the evidence presented. At no time did the judge convey to the jury his opinion as to the guilt or innocence of the defendant." *State* v. *Gordon,* 197 Conn. 413, 425–26, 504 A.2d 1020 (1985). In addition, at the close of evidence the court instructed the jury that it was the sole finder

of facts, and that it was not to draw any inferences on the basis of questions that the court may have asked the witnesses. "Such curative instructions are entitled to great weight and ordinarily prevent an appellate court from finding that the trial court committed reversible error." (Internal quotation marks omitted.) *State* v. *Youdin*, 38 Conn. App. 85, 94, 659 A.2d 728 (1995); *State* v. *Fernandez*, supra, 198 Conn. 17.

### III

### APPOINTMENT OF THE GUARDIAN AD LITEM

Finally, we address the defendant's claim pertaining to the appointment of a guardian ad litem for the victim. The defendant claims that the trial court violated his constitutional rights to due process and a fair trial under the fourteenth amendment to the United States constitution and article first, § 8, of the constitution of Connecticut, by compelling the victim to testify, despite the expressed opposition of the victim's parents to having her testify, through the appointment of a guardian ad litem.[17] The state argues that the defendant lacks standing to raise a claim pertaining to the appointment of the guardian ad litem because the rights violated, if any, were those of the victim or her parents, not the defendant. We agree with the state, but we take this opportunity to comment on the process used by the trial court in appointing the guardian ad litem and the guardian ad litem's role in the proceedings, and to provide guidance concerning this issue if it arises again on remand.

The following additional facts are necessary to the resolution of this claim. Just prior to the trial court calling the jury in for trial, the defendant informed the

---

[17] The defendant fails to provide any independent analysis of this claim pursuant to the state constitution. Accordingly, we limit our analysis to those guarantees provided in the federal constitution. See *State* v. *DeJesus*, 270 Conn. 826, 834 n.14, 856 A.2d 345 (2004).

trial court that "there was some question as to whether the victim was . . . going to testify," and requested that the trial court "interview or question the victim's parents, who are her legal guardians, to ensure that they are not being forced against their will to have this victim testify." When asked to produce authority to indicate that the trial court had to question the parents about whether the child was being forced to testify, counsel for the defendant claimed that the parents had contacted her twice, alleging that the victim's father had been threatened with arrest, by an individual whom they believed to be a policeman, if the victim failed to testify. Defense counsel then argued that such coercion violated the defendant's constitutional rights because, to avoid repercussions from the state, the testimony would be tailored to satisfy the state. When asked, once again, to produce authority indicating that the court had to question the parents, defense counsel responded, "my authority is the constitution," to which the court replied, "[w]e're going to proceed with this trial. You've always got the opportunity to cross-examine any witness who's called to the stand . . . ."

After the trial court had seated and instructed the jury, the state called the victim as its first witness and immediately requested a sidebar. Following the sidebar, the trial court excused the jury, and the state informed the court that "the mother does not want her daughter to testify at this point in time." Therefore, the state requested the court to order the victim to testify. In reply, the trial court initially asked for some authority to show that it had the power to make such an order, but then sought further clarification of the situation. The state's attorney responded as follows: "I believe the daughter's willing to testify. But the mother said she does not want her daughter to go through this and wants her daughter to put this all behind her." The trial court then took a recess to "give this some thought."

Following a meeting with counsel for the state and the defendant in chambers, the trial court had the victim's mother brought into the courtroom to determine if she would be willing to allow the victim to testify on video-tape, outside the presence of the defendant. The victim's mother responded, "I don't want my—No. I don't want my daughter to testify at all, you know, in a room or alone or here or anywhere." The trial court then reminded the victim's mother of the seriousness of the allegations in the case, to which she responded: "Yeah, I understand that. Like I said, I'm trying to make her forget everything. And I, myself, am making her remember all of this, and I want her to forget all of this." The trial court then ordered a recess and offered the state's attorney an opportunity to speak with the victim's mother and the victim. The court overruled the defendant's objection to the state speaking to the mother.

Following another meeting with counsel in chambers and an opportunity for the trial court to do some research on "the feasibility of appointing a guardian in lieu of the mother—a guardian for the witness," the state moved for appointment of a guardian ad litem. The following colloquy then took place between counsel for the defendant and the trial court:

"[Defense Counsel]: . . . I think that if the state is seeking to have a guardian ad litem appointed for a minor child, that the minor child's parents should both be in the courtroom, should be a party to the proceedings, and should have the benefit of the Spanish interpreter. And I also think that they should be advised of their right to counsel, the right—

"The Court: Well, why don't you let counsel make the motion. . . . I know you want to say all these things, but I want to hear the motion first.

"[Defense Counsel]: Your Honor, I think they have the right to be here when there's a motion being heard.

"The Court: Counsel, I said you're going to get an opportunity. You don't represent them, in any event, so . . . . Make your motion."

The state then moved for appointment of a guardian ad litem pursuant to Practice Book § 44-20.[18] The state argued that the victim fell under the guardian ad litem provision, and that it had not been aware that the victim's parents would not allow the victim to testify. When offered the opportunity to respond to the motion, counsel for the defendant disputed the contention made by the state's attorney that she had not known that the parents would not allow the victim to testify and asserted that "the child's parents should be here in this courtroom. . . . The state is seeking an order from the court that will interfere with the rights of the parents." The following colloquy then occurred between the trial court and counsel for the defendant:

"The Court: You don't represent [the parents], so make an argument on behalf of your client.

"[Defense Counsel]: I don't represent them, but they do have rights here in this courtroom. They have the right to appointment of counsel, they have the right to be heard.

"The Court: And I said you don't represent them, so make an argument on behalf of your client.

"[Defense Counsel]: And if I could just be clear if the court is denying my motion to have . . . .

"The Court: I haven't said anything. I said, 'Argue on behalf of your client.' You want to tell me about the rights of the alleged victim's parents and you don't

[18] Practice Book § 44-20 (a) provides in relevant part: "In any criminal proceeding involving an abused or neglected minor child, a guardian ad litem shall be appointed. The judicial authority may also appoint a guardian ad litem for a minor involved in any other criminal proceedings . . . ."

represent them. So I will hear you in regard to your client.

"[Defense Counsel]: And I just want to make sure that the record is clear that the court is either refusing to act on my request or is denying the request.

"The Court: I don't know what your request is. . . . You want to tell me about the rights of the parents, and I want to hear your argument about your client.

"[Defense Counsel]: My request is that the parents be present in the courtroom during this hearing.

"The Court: Finish your argument.

"[Defense Counsel]: That they be advised of their right to counsel; that the right to make decisions for children is a basic right, and the court cannot deprive any parents of that right without procedural safeguards, including the right to counsel before any hearing.

"I would also indicate to the court that I oppose an appointment of guardian ad litem. I think the case law shows that the common-law presumption is that the parents are acting in the best interest of their children.

"There has been no evidence presented that these parents are not acting in the best interest of their children. There's nothing to indicate that the child would be adversely affected by the parents' decision, just the state's assertion this morning that the state's case would be affected. . . . I would submit to the court that here there has been no evidence admitted, just the state's attorney's argument on behalf of the state that the child's interest would be adversely affected.

"The Court: All right, counsel—

"[Defense Counsel]: Your Honor, I haven't finished. I haven't finished.

"The Court: Yes. Yes, you have. Because we're going to move on. We have a jury here. I'm going to bring the mother in. . . .

"[Defense Counsel]: I have further . . . .

"The Court: I don't . . . want to hear any further argument.

"[Defense Counsel]: Well, I will just put for the record that if the court is going to grant the motion, I have additional requests."

The parents were brought into the courtroom and identified themselves to the court.[19] The trial court then confirmed that the parents understood that their daughter was a witness in a sexual assault case and had been subpoenaed to the court to testify. After confirming that the parents did not want their daughter to testify, the trial court directed the parents to "[e]xplain why not." The victim's mother responded: "Because, in the first place, she doesn't want to speak because she hasn't heard what she and I have—and so she—She hasn't heard us speaking about it, but she thinks this whole problem is because of her. So, I don't want to put her through any more." The victim's father expressed his agreement with this explanation.

The trial court then explained to the parents that, pursuant to the rules of practice, it had discretion to appoint a guardian ad litem, "that is someone to look out for the best interest of your child while here in court testifying," for the victim. When asked by the victim's mother whether it could do so without her authorization allowing the child to testify, the court replied that it had that authority. When asked if she understood that the court had such authority, the mother replied, "Well, if you say that you have the

---

[19] The exchanges with the parents of the victim were translated through a Spanish interpreter.

authority to do that, what else could I say?" When asked again if she understood, the mother replied, "Yes."

The trial court then asked the parents to explain why it should not appoint a guardian ad litem and stated, "unless you tell me a reason why [the victim] shouldn't [testify], I'm going to appoint a guardian and have her testify." The victim's mother responded, "Well, I don't want her to talk because I'm trying to have her forget all of this, and so being here in front of all these people and have [to] testify—and all these people—she's a five year old, and I'm just creating more problems for her." The victim's father chose not to respond. The trial court then excused the parents and asked for comments from counsel, at which point the counsel for the defendant reiterated that "[t]here's still been no evidence presented that it would—that the parents are not acting in the best interest of the child. . . . The court has to make that finding first. There has been no evidence presented."

The trial court subsequently granted the state's motion and stated: "I'm going to appoint the family relations office as guardian ad litem for the minor child, and the guardian is to look out for the best interest of the child; not to tell the child what to say or how to testify, simply to look out for her best interest. We're going to proceed." This action prompted a discussion concerning the role of the guardian ad litem.[20] Following

[20] The following colloquy took place between defense counsel and the trial court at this point in the proceedings:

"[Defense Counsel]: . . . The court had said earlier that you were going to appoint a guardian ad litem and have the minor child testify. I believe that it's up to the guardian ad litem to determine whether or not it's in the best interest of the child to testify, and that—

"The Court: [Counsel], you keep making arguments on behalf of the minor child and the minor child's parents. You don't represent the minor child, you don't represent the parents; so you have absolutely no standing to make any of those arguments.

"I've listened to you, I've considered what you had to say; but there's an allegation that a young child was sexually assaulted, and I think, under the circumstances here—This child is a witness. She, like any other person

this discussion, the trial court appointed the guardian ad litem during the following exchange with defense counsel:

"[Defense Counsel]: If I could just inquire as to whether the guardian—who the guardian is that's going to be appointed, and whether, in fact, she has met—

"The Court: Is someone here from family relations? Hold up for a minute.

"Ms. [Lisa] Leogrande: Yes, Your Honor.

"The Court: Identify yourself, please.

"Ms. Leogrande: Lisa Leogrande, family relations counselor.

"The Court: All right. Fine.

---

who is summoned—or subpoenaed, rather, has an obligation to give any testimony in regard to a criminal proceeding, and I think it's in her best interest for her to testify. If she—She says whatever she says when she gets in here, so I don't wish to hear any further argument. We're going to—

"[Defense Counsel]: Your Honor, I do have further—

"The Court: We're going to proceed with the testimony.

"[Defense Counsel]: I do have further argument.

"The Court: I don't wish to hear any. We're going to bring the jury out and we're going to proceed. . . .

"[Defense Counsel]: I've just put on the record, so that it's clear, that I want this . . . .

"The Court: Counsel, this court controls these proceedings. I've given you an opportunity to speak. If I say I don't want to hear any more argument, I mean what I say. And if you keep pushing this thing, and talking when I ask you not to, I'm going to consider sanctioning you. This court controls these proceedings.

"You've said what you had to say. I don't wish to hear any more argument. I want to proceed.

"Bring the jury out.

"I don't want to hear any more argument.

"[Defense Counsel]: I'm not going to make any argument. However, I will . . . .

"The Court: I don't want to hear anything else.

"[Defense Counsel]: I have the right to represent my client.

"The Court: I control these proceedings. And I said, 'I don't want to hear anything else.' "

"[Defense Counsel]: And has [Leogrande] met the person that she's guardian for?

"The Court: Stop. I don't want to—I'm not going to—I don't want to hear anything else. Bring the jury out.

"[Defense Counsel]: Is the court suggesting that it's not necessary—

"The Court: Bring the jury out—

"[Defense Counsel]:—that [Leogrande] not meet the person she's guardianing.

"The Court: Bring the jury out . . . ."

After the jury was seated, the state called the victim as its first witness. Before the victim took the stand, the trial court informed the jury that the witness had an interpreter standing next to her and a family relations officer sitting nearby who would act as her guardian. The court also instructed the jury that the presence of the interpreter and the guardian should have no affect on its determination of the facts of the case.

## A

### Standing

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . The question of standing does not involve an inquiry into the merits of the case. It merely requires the party to make allegations of a colorable claim of injury to an interest which is arguably protected or regulated by the statute or constitutional guarantee in question." (Citations omitted; internal quotation marks omitted.) *State* v. *Pierson*, 208

Conn. 683, 687, 546 A.2d 268 (1988), cert. denied, 489 U.S. 1016, 109 S. Ct. 1131, 103 L. Ed. 2d 193 (1989).

"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury [that] he has suffered or is likely to suffer, in an individual or representative capacity." (Internal quotation marks omitted.) *Broadnax* v. *New Haven*, 270 Conn. 133, 153, 851 A.2d 1113 (2004).

The defendant fails to make a colorable claim of direct injury. The appointment of the guardian ad litem intruded not upon any right of the defendant but, as discussed later in this opinion, upon the parents' constitutional right to the care, custody and control of their child. See *Denardo* v. *Bergamo*, 272 Conn. 500, 511, 863 A.2d 686 (2005). "We have uniformly resisted the efforts of litigants to assert constitutional claims of others not in a direct adversarial posture before the court. . . . Under long established principles, a party is precluded from asserting the constitutional rights of another." (Citations omitted; internal quotation marks omitted.) *Superintendent of Police* v. *Freedom of Information Commission*, 222 Conn. 621, 630, 609 A.2d 998 (1992).

The defendant attempts to circumvent this prohibition against asserting the constitutional rights of another by arguing that the rights of the victim and her parents are "intertwined" with his right to a fair trial, which, he contends, the trial court violated by failing to follow the proper rules and procedures when it com-

pelled the testimony of the victim. We are unpersuaded. The case law of this court and the United States Supreme Court makes clear that "the right to be free from testimonial compulsion is a personal one that may not be asserted vicariously." *State* v. *Williams*, 206 Conn. 203, 208, 536 A.2d 583 (1988). In the present case, that right belonged to the parents of the victim, and the defendant cannot acquire it by cloaking his claim in a violation of the court's rules and procedures.

## B

### Guardian Ad Litem

Despite the fact that the defendant lacks standing to assert the constitutional rights of the parents, we deem it appropriate to address the trial court's actions pertaining to the guardian ad litem because the issues associated with those actions may arise again on remand. See *Ireland* v. *Ireland*, 246 Conn. 413, 435, 717 A.2d 676 (1998). We conclude that, before the trial court appointed a guardian ad litem to supersede their judgment in determining what was in the best interest of their child, the victim's parents were entitled to a hearing and notice that they could be represented by counsel at that hearing. We also conclude that the trial court failed to permit the guardian ad litem to perform her proper function.

"[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." (Internal quotation marks omitted.) *Denardo* v. *Bergamo*, supra, 272 Conn. 511, quoting *Troxel* v. *Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Furthermore, the common law long has recognized the right of parents to speak for their minor children. See *Parham* v. *J.R.*, 442 U.S. 584, 621, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979) (Stewart, J., concurring). Although the "state is not

without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized"; id., 603; "so long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the [s]tate to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Denardo* v. *Bergamo*, supra, 505, quoting *Troxel* v. *Granville*, supra, 68–69. In essence, a strong but rebuttable presumption exists that the responsibility for making decisions and speaking for minor children vests in the parents, but the state, acting as parens patriae, maintains the right to assume that responsibility in exceptional cases. See *Bowen* v. *American Hospital Assn.*, 476 U.S. 610, 627, 106 S. Ct. 2101, 90 L. Ed. 2d 584 (1986).

The fact that the parents in the present case possessed decision-making authority, however, does not mean that the state had no interest in whether the victim should testify. The state has a "vital interest in the enforcement of its criminal laws. 'The safeguards that the [c]onstitution accords to criminal defendants presuppose that government has a sovereign prerogative to put on trial those accused in good faith of violating valid laws. Constitutional power to bring an accused to trial is fundamental to a scheme of "ordered liberty" and prerequisite to social justice and peace.' *Illinois* v. *Allen*, [397 U.S. 337, 347, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970)] (Brennan, J., concurring). In balancing the rights of the accused against state interests in enforcement of criminal laws, the United States Supreme Court has made reference to 'the community's vital interests in law enforcement'; *Winston* v. *Lee*, 470 U.S. 753, 759, 105 S. Ct. 1161, 84 L. Ed. 2d 662 (1985); and has noted that 'the community's interest in fairly and accurately determining guilt or innocence . . . is of course of

great importance.' " *State* v. *Garcia*, 233 Conn. 44, 74–75, 658 A.2d 947 (1995), on appeal after remand, 235 Conn. 671, 669 A.2d 573 (1996). In order to effectuate its prerogative to try the defendant in the present case, the state subpoenaed the victim to provide testimony concerning her allegations of sexual abuse against the defendant.

In the present case, the victim's parents informed the trial court of their decision not to allow their daughter to testify. The state, however, asserted its legitimate interest in law enforcement by having the child testify. This clash of weighty interests required a hearing, with appropriate due process safeguards, before the court could take the drastic step of displacing the parents' constitutionally protected decision-making authority by appointing a guardian ad litem without first making a determination that such displacement was justified. Although we need not delineate in detail the form of that hearing at this junction, we conclude that those safeguards include, at a minimum, reasonable notice to the parents of the purpose of the hearing, recognition of their right to counsel at the hearing, and time to prepare therefor consistent with the need for the trial to begin.[21] Moreover, although the trial court found that "it's in [the victim's] best interest for her to testify," and appointed the guardian ad litem to effectuate its decision to compel the victim to testify, the record reveals no evidence on which to base such a finding.[22]

---

[21] We note that all of these proceedings took place before any evidence had been introduced at trial. Thus, presumably, it would not have been impracticable to excuse the jury until after the hearing was held, a decision was reached as to the appointment of the guardian ad litem, and the guardian ad litem had an opportunity to perform her proper function.

[22] Although the state argues that "it is clear that the reason for [the mother's] objection [to the victim testifying] was not to shield her daughter from the trauma of testifying at trial, but was, instead, to shield the defendant from criminal prosecution and to maintain peace within her extended family," and that "any trauma experienced by the victim in testifying at trial would be slight compared to the trauma inflicted upon her by the defendant's sexual abuse," no basis for making such claims exists in the record prior to the

It is true that the trial court had the general authority to appoint a guardian ad litem pursuant to that portion of Practice Book § 44-20 (a), which provides that "[t]he judicial authority may also appoint a guardian ad litem for a minor involved in any other criminal proceedings . . . ."[23] That general authority, however, must be exercised consistently with the relative interests involved in such an appointment. Thus, the court was required to conduct a hearing to weigh the relative interests of the parents and the state before it usurped the constitutionally protected decision-making authority of the parents.

Furthermore, in the present case, the victim had a guardian ad litem in name only. The record indicates

court's decision to appoint the guardian ad litem. At the point in the proceeding when the court compelled the victim to testify, the only information that it had concerning the mother's motive was the mother's repeated assertions that she was concerned about putting her daughter through more trauma and creating problems for her daughter, and the claims of the state's attorney that "[the mother] says that they have worked things out with her family. It's a close family. . . . I believe that she feels that there could be some retaliation if, in fact, her daughter testifies." (Emphasis added.)

We recognize that, during the trial, the mother testified that she did not want to report anybody, and that Ron-Priola testified that the mother did not want to get the defendant in trouble and did not report the abuse to the department. That testimony, however, was not before the trial court when it decided to appoint the guardian ad litem.

[23] The state argues that the trial court was *required* to appoint a guardian ad litem pursuant to the following language in Practice Book § 44-20 (a): "In any criminal proceeding involving an abused or neglected minor child, a guardian ad litem shall be appointed. . . ." We disagree. The primary purpose of that section is to provide for a guardian ad litem in abuse or neglect cases where the parent or legal guardian is the defendant because the defendant's interest is clearly adverse to the best interests of the child in such cases. The state's interpretation of the section would have required appointment of a guardian ad litem even in the absence of parental objection to allowing the victim to testify. Such an interpretation would routinely displace a parent's constitutionally protected relationship even in cases where there is no showing of any need therefor. A guardian ad litem need not be routinely appointed in every criminal case involving child sexual abuse where the parent or guardian of the child is not implicated, because the parents are entrusted with the presumed authority to make those decisions necessary to protect the child in such cases.

that Leogrande was not given an opportunity to consult with the victim, her parents or anyone else who might have any insight concerning potential trauma to the victim associated with testifying. When asked by defense counsel if Leogrande had met with the victim, the trial court responded, "I don't want to hear anything else." Moreover, Leogrande was not even given time to consider what she might do to represent the victim's interests. Instead, upon determining that an individual from family relations was present, the trial court, before compelling the victim to testify, had Leogrande identify herself, directed where she should sit, and informed the jury that she would act as guardian. Under those circumstances, Leogrande's role appears to have been to serve as confirmation that the victim's best interests had been considered before compelling her to testify. Whatever Leogrande's role was intended to be, she did not perform the function of a guardian ad litem.

In summary, if, on remand, the state moves for the appointment of a guardian ad litem to compel the victim's testimony, the trial court should conduct a hearing to determine if granting that motion is appropriate. The parents of the victim should be given notice of that hearing and informed that they are allowed to have counsel at that hearing to assist in the protection of their rights.[24] In addition, if, at the conclusion of that hearing, the trial court concludes that appointment of a guardian ad litem is appropriate under the circumstances, it must allow the guardian ad litem a reasonable opportunity to perform her function. The guardian ad litem serves as the representative of the child's best interests. *Ireland* v. *Ireland*, supra, 246 Conn. 439.

---

[24] We need not decide, at this juncture, whether they are entitled to appointed counsel if they cannot afford one, because the record does not contain any facts necessary to such an inquiry. If in a subsequent trial, however, the evidence shows the parents of the victim to be indigent, the trial court should appoint counsel for them.

Inherent in that role is the requirement that the guardian ad litem be provided a reasonable opportunity to assess those interests by, at the least, meeting with the child and the child's parents, and with any other persons that the guardian ad litem deems appropriate.

The state argues that, even if a hearing was required before the trial court appointed the guardian ad litem, "the trial court held such a hearing by questioning the victim's mother and father on this issue, and by hearing arguments of counsel." We are unpersuaded. Although we need not specify the exact parameters of the required hearing, the process employed in the present case did not suffice to protect the parents' constitutionally protected rights. The parents were not informed that there would be a hearing to adjudicate their constitutional rights, nor were they informed that they could have counsel present. As pointed out by both the trial court and the state, defense counsel lacked standing to advocate for the parents' rights. Thus, the arguments of counsel did not serve to protect those rights.

The judgment is reversed with respect to the defendant's conviction of risk of injury to a child under count three of the information, and the case is remanded to the trial court for a new trial on that count; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.