******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* TAYLOR G.*
(SC 19222)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued September 16, 2014—officially released March 17, 2015*

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Robin S. Schwartz*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael Pepper*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Taylor G., appeals from the judgments of conviction, rendered after a jury trial, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), one count of sexual assault in the fourth degree in violation of General Statutes (Rev. to 2007) § 53a-73a (a) (1) (A), as amended by Public Acts 2007, No. 07-143, § 2, and one count of risk of injury to a child in violation of General Statutes (Rev. to 2007) § 53-21 (a) (2), as amended by Public Acts 2007, No. 07-143, § 4. The defendant claims that (1) the trial court's imposition of the ten year mandatory minimum sentence for the first degree sexual assault conviction[1] and the five year mandatory minimum sentence for the risk of injury conviction,[2] even though the defendant was only fourteen and fifteen years old when he committed the crimes,[3] violates the requirement under the eighth amendment to the United States constitution[4] that a child offender receive a proportionate and individualized sentence from a sentencer empowered to consider and give effect to the mitigating qualities of the child's youth, (2) the state's expert witness improperly vouched for the credibility of the victim, C, and (3) the trial court improperly admitted evidence of sexual misconduct committed by the defendant when he was thirteen years old. The state responds that (1) the trial court considered the defendant's status as a juvenile offender when it imposed the mandatory minimum sentences, which were proportional to the crimes, (2) the state's expert witness did not vouch for C's credibility, and (3) the court properly admitted evidence of the defendant's sexual misconduct when he was thirteen years old. We affirm the judgments of the trial court.

The jury reasonably could have found the following facts. On November 13, 2009, the defendant was arrested for sexually assaulting his cousin, C. The assaults occurred between July 17, 2007, and February, 2009, at the home of the defendant's mother in the city of New Haven and at the homes of the defendant's relatives in the town of Hamden. At the time of the assaults, the defendant was fourteen and fifteen years old, and C was six and seven years old. When C finally told his mother about the assaults, she immediately reported them to the police.

Due to the serious nature of the charges, the defendant's cases were transferred from the juvenile docket to the regular criminal docket pursuant to General Statutes § 46b-127 (a) (1).[5] On June 5, 2012, following a jury trial, the defendant was found guilty of all three offenses. On November 2, 2012, while awaiting his sentence, the defendant filed a motion requesting a sentence below the mandatory minimums of ten years and five years, respectively, for first degree sexual assault and risk of injury to a child, claiming that imposition of

the mandatory minimums for crimes he had committed when he was fourteen and fifteen years old would violate the eighth amendment prohibition against cruel and unusual punishment and the equal protection clause of the fourteenth amendment to the United States constitution. On that date, the defendant also filed a motion for a new trial, claiming that the trial court improperly had admitted the testimony of an expert witness who impermissibly had vouched for C's credibility, which was critical to the outcome of the case. At a hearing in January, 2013, the trial court considered both motions. On February 27, 2013, the court denied the motion for a new trial, and, on March 12, 2013, it denied the motion to sentence the defendant below the mandatory minimums. On March 13, 2013, the court imposed a total effective sentence of ten years incarceration followed by three years of special parole.[6] This appeal followed.

I

The defendant first claims that the ten and five year mandatory minimum sentences for first degree sexual assault and risk of injury to a child, respectively, when applied to a juvenile offender, violate the eighth amendment right to an individualized, proportionate sentence because the sentencing court is unable to consider and give effect to relevant mitigating evidence of the offender's youth and immaturity. The state rejects the defendant's claim on the ground that he overstates the scope of the governing federal law. We agree with the state.

The following additional facts are relevant to our resolution of this claim. In its memorandum of decision on the motion to sentence the defendant below the mandatory minimums, the court discussed the applicable federal law and concluded that the mandatory minimum sentences in the defendant's case "lack[ed] the severity necessary to be considered constitutionally disproportionate." The court also concluded that the mandatory minimum sentences did not "strip the court of its ability to exercise broad discretion in fashioning an appropriate sentence." The court explained that, "[f]or his three convictions, the defendant faces up to fifty-five . . . years incarceration. The court may impose this maximum sentence, or may choose to impose a sentence considerably more lenient. In making that determination, the court may consider the mitigating effects of the defendant's youth, including . . . a juvenile's diminished culpability and greater prospects for reform. . . . The court thereby may ensure that the defendant receives the individualized sentencing consideration to which he is entitled." (Citation omitted; internal quotation marks omitted.)

During the sentencing hearing on March 3, 2013, the court expressed reservations as to whether mandatory minimum sentences were appropriate in a juvenile setting, especially when an offender, like the defendant,

was only fourteen and fifteen years old at the time he committed the crimes. The court observed that it appeared that the defendant had experienced abuse as a child, and that such a child sometimes becomes an abuser as an adult. The court also noted that, when the legislature enacted the mandatory minimum sentencing provisions, it was not contemplating fourteen year old offenders but, rather, offenders who were significantly older. The court nonetheless concluded: "I still feel duty bound under my role in our criminal justice system to follow the rules and the sentences the legislature has enacted. But to the extent that people have asked me to be as lenient as I can, that's what I'm being. I'm being as lenient as I can. I suspect not lenient enough in the view of those who spoke on [the defendant's] behalf, but, to quote what somebody said, I am being as lenient as I possibly can, but I think that's adequate punishment for an individual who commits crimes when he's fourteen years of age." The court then sentenced the defendant to the mandatory minimum of ten years incarceration on the first degree sexual assault count followed by three years of special parole, one year incarceration on the fourth degree sexual assault count, and ten years incarceration, five of which were mandatory, on the risk of injury count. The court ordered that the latter two sentences be served concurrently with the first sentence, for a total effective sentence of ten years incarceration followed by three years of special parole.

The standard of review is well established. "A challenge to [t]he constitutionality of a statute presents a question of law over which our review is plenary." (Internal quotation marks omitted.) *Keane* v. *Fischetti*, 300 Conn. 395, 402, 13 A.3d 1089 (2011). With respect to the governing legal principles, the defendant relies on *Roper* v. *Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), *Graham* v. *Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), and *Miller* v. *Alabama*, U.S. , 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), in which the United States Supreme Court established a series of rules to be applied in the sentencing of juvenile offenders.[7]

In explaining the evolution and development of these rules, the court in *Miller* began by noting that "[t]he [e]ighth [a]mendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions . . . [and] flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." (Citation omitted; internal quotation marks omitted.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2463. The court then described "two strands of precedent reflecting [its] concern with proportionate punishment." Id. The first strand consisted of cases in which the court had "adopted categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a

penalty. . . . Several of the cases in this group . . . specially focused on juvenile offenders, because of their lesser culpability. Thus, *Roper* held that the [e]ighth [a]mendment bars capital punishment for children, and *Graham* concluded that the [a]mendment also prohibits a sentence of life without the possibility of parole for a child who committed a nonhomicide offense. *Graham* further likened life without parole for juveniles to the death penalty itself, thereby evoking a second line of . . . precedents. In those cases, [the court] . . . prohibited mandatory imposition of capital punishment, requiring that sentencing authorities consider the characteristics of a defendant and the details of his offense before sentencing him to death." (Citations omitted; internal quotation marks omitted.) Id., 2463–64. The court thus concluded that, due to "the confluence of these two lines of precedent . . . mandatory life-without-parole sentences for juveniles violate the [e]ighth [a]mendment." Id., 2464.

The court elaborated that "*Graham* and *Roper* and [its] individualized sentencing cases alike teach that in imposing a [s]tate's harshest penalties, a sentencer misses too much if he treats every child as an adult. . . . Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. . . . And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (Citations omitted.) Id., 2468. The court thus determined: "[A] judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without [the] possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before [the court] violate this principle of proportionality, and so the [e]ighth [a]mendment's ban on cruel and unusual punishment." Id., 2475.

In sum, all three federal cases recognized that, because the eighth amendment prohibition against cruel and unusual punishment is based on the principle that punishment should be graduated and proportioned

to the offender and the offense, courts must consider mitigating evidence of youth and immaturity when sentencing juvenile offenders. Thus, applying this principle, the death penalty is a disproportionate sentence for juvenile offenders, regardless of the crime; see *Roper* v. *Simmons*, supra, 543 U.S. 573–75; life imprisonment without the possibility of parole is a disproportionate sentence for juveniles convicted of a nonhomicide crime; *Graham* v. *Florida*, supra, 560 U.S. 74; and mandatory life imprisonment without the possibility of parole is a disproportionate sentence for juveniles convicted of a homicide, although a sentence of life imprisonment without the possibility of parole may be deemed appropriate *following* consideration of the child's age-related characteristics and the circumstances of the crime. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2469; see also id., 2475 ("*Graham, Roper*, and [the court's] individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances *before* imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without [the] possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes [at issue] violate this principle of proportionality . . . ." [Emphasis added.]).

In light of this precedent, we disagree with the defendant that his ten and five year mandatory minimum sentences violated the eighth amendment prohibition against cruel and unusual punishment. The defendant's sentences not only were far less severe than the sentences at issue in *Roper, Graham* and *Miller*, but were consistent with the principle of proportionality at the heart of the eighth amendment protection because the mandatory minimum requirements, while limiting the trial court's discretion to some degree, still left the court with broad discretion to fashion an appropriate sentence that accounted for the defendant's youth and immaturity when he committed the crimes.

A

We first agree with the trial court that the defendant's ten and five year mandatory minimum sentences lack the severity of the sentences at issue in *Roper, Graham* and *Miller*. In those cases, the court concluded there was a constitutional violation because the sentences consisted of death or life imprisonment without the possibility of parole, the two most severe punishments courts are able to impose. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2467–68; *Graham* v. *Florida*, supra, 560 U.S. 70; *Roper* v. *Simmons*, supra, 543 U.S. 568. The difference between these and other sentences is not merely quantitative. There is also a qualitative difference. Death is final and irrevocable, unlike any other sentence. Life in prison without the possibility of parole is also final

and irrevocable in the sense that it deprives the offender of all hope of future release and of living a normal life, even if he or she is successfully rehabilitated and capable of returning and making a positive contribution to society. These differences were recognized by the courts in all three cases, each of which described the punishment in question as unique in its severity. See *Miller* v. *Alabama*, supra, 2465, 2466, 2468 (repeatedly characterizing life imprisonment without possibility of parole as "harshest" possible penalty for juveniles); *Graham* v. *Florida*, supra, 69–70 (stating that "life without parole is 'the second most severe penalty permitted by law' " and that "life without parole sentences share some characteristics with death sentences that are shared by no other sentences" because "the sentence alters the offender's life by a forfeiture that is irrevocable . . . without giving hope of restoration"); *Roper* v. *Simmons*, supra, 568 ("[b]ecause the death penalty is the most severe punishment, the [e]ighth [a]mendment applies to it with special force").

Although the deprivation of liberty for any amount of time, including a single year, is not insignificant, *Roper*, *Graham* and *Miller* cannot be read to mean that all mandatory deprivations of liberty are of potentially constitutional magnitude. In the present case, the ten and five year mandatory minimum sentences, under which the defendant is likely to be released before he reaches the age of thirty, do not approach what the court described in *Roper*, *Graham* and *Miller* as the two harshest penalties. Thus, the defendant's sentences do not implicate the factors deemed unacceptable in *Roper*, *Graham* and *Miller* when those penalties are imposed on juveniles, namely, the futility of rehabilitation and the permanent deprivation of all hope to become a productive member of society, both of which occur when the court is prevented from taking a second look at the incarcerated offender's demonstrated growth and maturity. Rather, the defendant in the present case will be able to work toward his rehabilitation and look forward to release at a relatively young age. Accordingly, from the standpoint of the severity of the mandatory ten and five year sentences at issue in this case, *Roper*, *Graham* and *Miller* provide no support for the defendant's claim that the sentences constitute cruel and unusual punishment when applied to a juvenile offender.

### B

We also agree with the trial court that the mandatory minimum sentences, as applied to the defendant, did not otherwise violate the principle of proportionality articulated in *Roper*, *Graham* and *Miller*. That is because, unlike in those cases, the sentencing provisions at issue in the present case left the trial court with discretion to choose from a wide range of sentencing possibilities that equaled or exceeded the minimum

term of imprisonment. Although the defendant was subject to a maximum sentence of fifty-five years incarceration on all charges, the court stated at the sentencing hearing that it intended to be as lenient as possible, considering the defendant's age at the time he committed the crimes, and it thus sentenced the defendant to a total effective sentence of only ten years incarceration, followed by three years of special parole.

Insofar as the defendant argues that the mandatory minimum sentencing provisions prevented the court from *fully* exercising its discretion, the trial court stated that it did not view the sentences as "strip[ping] the court of its ability to exercise broad discretion in fashioning an appropriate sentence." All mandatory minimum sentences limit, to some extent, the discretion of courts to craft a sentence that accounts for the special characteristics of the offender and the offense. Even mandatory minimum sentences of one or two years limit the discretion of courts by precluding the imposition of lesser sentences on offenders regarded as deserving of a lesser penalty because of compelling mitigating factors. See, e.g., General Statutes § 53a-61a (d) (requiring mandatory minimum sentence of one year incarceration for third degree assault of elderly, blind, disabled or pregnant person, or person with intellectual disability); see also General Statutes § 29-35 (a) (requiring mandatory minimum sentence of one year incarceration for carrying pistol without permit). The limitations that mandatory minimum sentences place on a trial court's discretion, however, do not automatically constitute an eighth amendment violation. A mandatory minimum sentence is, by definition, the *least* punitive sentence that may be imposed under a sentencing statute. The question thus becomes whether the mandatory minimum sentences in the present case were so disproportionate, despite the court's decision to impose a total effective sentence amounting to a fraction of the maximum possible sentence, that they subjected the defendant to cruel and unusual punishment under *Roper*, *Graham* and *Miller*. In order to answer this question, we consider the defendant's total effective sentence in light of the crimes of which he was convicted.

The defendant received mandatory minimum sentences of ten years incarceration for sexual assault in the first degree and five years incarceration for risk of injury to a child. Under the first degree sexual assault statute, the defendant was charged with "engag[ing] in sexual intercourse with another person and such other person is under thirteen years of age and the actor is more than two years older than such person . . . ." General Statutes § 53a-70 (a) (2). Under the risk of injury to a child statute, the defendant was charged with "[having] contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subject[ing] a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and

indecent manner likely to impair the health or morals of such child . . . ." General Statutes (Rev. to 2007) § 53-21 (a) (2), as amended by Public Acts 2007, No. 07-143, § 4. General Statutes § 53a-65 (8) defines " '[i]ntimate parts' " as "the genital area or any substance emitted therefrom, groin, anus or any substance emitted therefrom, inner thighs, buttocks or breasts."

In the present case, C testified that the defendant put his hand down C's pants and "pushed [C's] penis in . . . [with] [h]is finger," "put his finger in [C's] butt," and "put his hand on [C's] penis and . . . rub[bed] it." C also testified that the defendant sometimes lay on top of him when their clothes were on and "hump[ed]" him. The assaults took place over a period of approximately eighteen or nineteen months when C was six and seven years old.

Given the gravity of these offenses, the tender age of C when they occurred, and the likelihood that C will suffer from the effects of the abuse for the remainder of his life, the mandatory minimum sentences cannot be said to be disproportionate under *Roper*, *Graham* and *Miller*. In *Graham*, the court made clear that juveniles convicted of nonhomicide crimes, such as the crimes committed by the defendant in the present case, are not immune from very harsh punishments, including life in prison, merely because of their youth when they committed the crimes. The court explained: "A [s]tate is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime. What the [s]tate must do . . . is give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. . . . It bears emphasis, however, that while the [e]ighth [a]mendment forbids a [s]tate from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the [s]tate to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The [e]ighth [a]mendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid [s]tates from making the judgment at the outset that those offenders never will be fit to reenter society." *Graham* v. *Florida*, supra, 560 U.S. 75.

From this passage, it is clear that the court in *Graham* did not disapprove of lengthy sentences for juvenile offenders convicted of nonhomicide crimes. The court instead objected to the fact that a sentence of life imprisonment without the possibility of parole would eliminate at the outset any future opportunity for such offenders to demonstrate growth and maturity by using their time in prison to rehabilitate and become productive members of society. The court in *Miller* went even

further when it endorsed the imposition of a life sentence without the possibility of parole for juvenile offenders convicted of homicide, provided the sentencing court first consider mitigating evidence relating to the offender's personal history and the nature of the crime. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2470–72.

In the present case, the trial court's decision to impose a sentence for first degree sexual assault that did not exceed the mandatory minimum and to allow the sentences for fourth degree sexual assault and risk of injury to be served concurrently with the sentence for first degree sexual assault was based on its consideration of the defendant's relative youth and immaturity when he committed the crimes, and will guarantee the defendant's future release at a relatively young age. The sentences were therefore consistent with the principles of individualized sentencing and proportionality articulated in *Roper*, *Graham* and *Miller*, and did not constitute cruel and unusual punishment under the eighth amendment.[8]

## II

The defendant next claims that Theresa Montelli, the state's expert witness on child abuse victims, improperly vouched for C's credibility. The defendant specifically claims that Montelli directly and indirectly vouched for C's credibility by making substantive use of C's out-of-court statements in her testimony regarding the general characteristics of sexually abused children. The state responds that Montelli did not vouch, directly or indirectly, for C's credibility but, rather, testified regarding the general characteristics of sexually abused children, offered no indirect opinions about C, and never testified that she previously had treated, or was currently treating, C for any reason. We agree with the state.

The following additional facts are relevant to our resolution of this claim. Prior to commencement of the trial, the state informed the court that it intended to offer testimony by Montelli relating to her interview with C and her knowledge of the general characteristics of sexually abused children, such as delayed reporting of the abuse and the ways in which a child victim recalls events. Although defense counsel objected to admission of this testimony, the court advised counsel that a specific objection should be made when the testimony was offered at trial.

Thereafter, C testified that, in the spring of 2007, when he was five years old and the defendant was thirteen years old, he was in the care of multiple family members and legal guardians. During the week, he lived in Hamden with three sisters, who were close friends of his mother, and an uncle. On Friday nights, he went to New Haven to stay with one of his mother's brothers. The rest of the weekend he spent with his mother, who

was living in New Haven with her second brother, his wife and their three sons, one of whom was the defendant.

During this time, C had a good relationship with the defendant, thought of him as a big brother, and frequently watched television and played video games with him. One day, however, when C was visiting his mother at the defendant's home, the defendant put his hand inside C's pants and touched him sexually, conduct that continued during other visits. Because C, who was only five years old at the time, did not understand that this conduct was "wrong," he did not tell anyone about it.

In June, 2007, just before C turned six years old, his mother moved out of the defendant's home and into her own apartment in New Haven. After the move, C's visiting schedule with his mother continued. During the week, he lived with the three sisters; on Friday nights, he went to the home of his mother's brother; and during the remainder of the weekend, he visited his mother at her new apartment.

Even though C's mother was no longer living with the defendant's family, C and the defendant continued to see each other regularly. Throughout that summer, the defendant visited the home of the three sisters three or four times a week, sometimes with his parents to help with chores, and other times for holidays and family parties. C also continued to see the defendant at the home of his mother's brother on Friday nights and at his mother's new apartment. Although C liked spending time and playing games with the defendant, the defendant continued to sexually abuse C at all three locations for the next eighteen or nineteen months. Finally, in February, 2009, when C was seven years old, he told his mother that the defendant had been inappropriately touching him and that the defendant had said he would kill C if C told anybody about what had happened. When asked why he finally told his mother, C explained: "I just couldn't take it anymore." One week later, Montelli interviewed C.

When the state was ready to call Montelli as an expert witness the following day, defense counsel objected by way of a motion in limine, in which he argued that she should not be allowed to give testimony regarding her forensic interview with C *and* the general characteristics of children who have been sexually abused. Counsel argued that allowing Montelli to testify about the general characteristics of sexually abused children immediately before showing the jury her video-recorded interview with C would compromise her appearance of impartiality as an expert witness and bolster C's allegations that he had been sexually abused by the defendant. In other words, allowing Montelli to testify for both purposes would amount to her giving an opinion that C's allegations were credible. Counsel thus suggested that the state call another equally qualified expert wit-

ness who had not conducted a forensic interview with C to testify regarding the general characteristics of sexually abused children.

The court denied the defendant's motion in limine, stating that it was unaware of any legal authority that would preclude an expert witness from testifying on both matters. The court stated that defense counsel was free to object if the state crossed the line in questioning Montelli and that it could cross-examine Montelli to reduce the risk of any possible confusion caused by her testimony. The court also informed counsel that it would entertain a request to give the jury a limiting instruction immediately before its deliberations delineating Montelli's two roles so that the jury would understand that her testimony describing the general characteristics of sexually abused children was not intended to identify any of C's particular characteristics.

Thereafter, Montelli testified that she was a clinical social worker and forensic interviewer for Yale-New Haven Hospital's Child Sexual Abuse Clinic (clinic) and explained that her office functioned as part of an interdisciplinary team. She stated that the purpose of forensic interviews was to collect facts in order to understand the alleged abuse from the child's perspective, to obtain information for use in the child's medical treatment, if treatment was deemed necessary, and to protect the child from further trauma by minimizing the number of times the child was required to speak with others about the experience.

Montelli next discussed the protocol for interviewing children brought to the clinic and her understanding of the general characteristics of children who have been sexually abused. With respect to the issue of delayed reporting, she noted that most sexually abused children do not report the abuse immediately and, in some cases, never report the abuse, often because they have a close relationship with the abuser. For example, an abuser may be a family friend or a family member to whom the child feels loyalty, such as a mother, father, uncle or cousin. In some cases, the child may delay disclosure if the perpetrator is an authority figure who has threatened or intimidated the child. In still other cases, the child may delay disclosure because of shame or embarrassment. Montelli also testified that a child's delayed disclosure may be due to a perceived lack of maternal support.

Montelli next discussed the effect of age on delays in reporting. She explained that children seven years old or younger may not know initially that what is happening is wrong because they have little or no understanding of sex or sexual abuse. Younger victims also have a limited understanding of time, and, therefore, the information they report may be unreliable because time is an abstract concept and multiple incidents often blend together. Thus, if a child has been exposed to

more than one incident of sexual abuse, the child may not be able to recall correctly the number of times the abuse occurred, the exact locations where it occurred, and the exact details of the abuse on each occasion.

When queried regarding her forensic interview with C, Montelli stated that she had conducted the interview at the clinic, the interview had been recorded, and a colleague had performed a medical examination of C following the interview. The jury then was shown the video recording of the interview. After the video recording was played, Montelli returned to the stand, where she testified briefly that she had not seen C since the interview, had not assisted in preparing C for trial, and had showed C anatomically correct dolls and diagrams during the interview for C to use in describing the abuse.

On cross-examination, Montelli stated that a delay in reporting or a limited understanding of the concept of time did not mean that a child's allegation of sexual abuse was truthful. She also agreed with counsel that some young children have a limited understanding of sexual activities. In response to a question regarding her personal knowledge as to whether C had been abused, Montelli testified: "My job isn't to say that allegations are true or not, or that . . . this child just told me the truth . . . . I don't make that determination." Defense counsel responded: "So, the answer is that you do not have any personal knowledge, and that's the question, any personal knowledge of whether these [allegations] are true or not?" Montelli replied: "No. . . . It was only what I heard from [C]." On redirect examination, Montelli reiterated that she did not "witness anything" connected with C's factual allegations.

During closing argument, defense counsel was the first to refer to Montelli's testimony, noting that a "so-called expert witness" for the state had described the general characteristics of abused children and then had appeared in the video-recorded interview with C, which might have suggested to the jury that what had happened to C was consistent with being sexually abused. Counsel directly refuted any such suggestion, however, by emphasizing Montelli's testimony that a delay in disclosure has nothing to do with whether a child is telling the truth or lying. He also argued that Montelli's testimony that children typically wait until the abuser is out of the house before disclosing the abuse did not apply in the present case because C did not live in the same house as the defendant for most of the time the alleged abuse occurred. Counsel dismissed Montelli's testimony that children often fail to timely disclose abuse if they are threatened by reminding the jury of C's testimony that no one ever had threatened him or told him not to tell anyone about the abuse while it was occurring, except for the very last time, after which he reported the abuse to his mother.

In rebuttal, the assistant state's attorney (prosecutor) reminded the jury that Montelli was not permitted to testify as to whether C exhibited any of the general characteristics of sexually abused children and that she was not permitted to testify that C was telling the truth because that issue was for the jury to decide. The prosecutor explained that Montelli's role was to describe, on the basis of her training and experience, the general characteristics of sexually abused children. The prosecutor then referred to many of the traits Montelli had discussed, including a child's concept of time, the impossibility of accurate recall by very young children when there have been multiple incidents of abuse, the reasons for a child's delay in reporting the abuse, and the types of relationships that commonly exist between perpetrators and victims.

Following the jury's determination that the defendant was guilty but before he was sentenced, the defendant filed a motion for a new trial on the ground that Montelli had vouched for C's credibility by giving the type of expert testimony this court deemed inadmissible in *State* v. *Favoccia*, 306 Conn. 770, 780, 51 A.3d 1002 (2012), namely, examples of the behavior of sexual assault victims closely resembling C's behavior, thus directly or indirectly connecting C's behavior with the behavioral characteristics of a sexual assault victim. The defendant argued that Montelli's testimony that children (1) often delay disclosing the abuse because of their close relationship with the abuser, (2) may fail to disclose or may choose to disclose the abuse when threats are made, (3) may fail to disclose the abuse when they feel a lack of maternal support or have a poor relationship with their mothers, (4) do not understand what is happening to them or that the abuse is wrong when they are seven years old or younger, and (5) have poor concepts of time and thus may incorrectly describe the number of incidents, where they occurred, and the details of the abuse when they are seven years old or younger, was similar to C's testimony that he (1) was abused by his cousin, the defendant, (2) did not disclose the abuse until the defendant threatened to kill him, (3) did not have a close relationship with his mother when the abuse occurred, (4) did not understand that the defendant's conduct was wrong, and (5) could not recall the exact number of incidents or the dates on which they occurred.

In denying the motion, the trial court disagreed with the defendant's characterization of the disputed testimony as the type of testimony at issue in *Favoccia*. The court observed that *Favoccia* stands for the proposition that, "although expert witnesses may testify about the general behavioral characteristics of sexual abuse victims, they cross the line into impermissible vouching and ultimate issue testimony when they opine that a particular complainant has exhibited those general

behavioral characteristics." (Internal quotation marks omitted.) The court then noted that neither the prosecutor, in his questions regarding the general characteristics of abused children, nor Montelli, in her responses, made any reference to C or sought to compare or link those general characteristics to C.

On appeal, the defendant renews his claim that Montelli's testimony regarding the general characteristics of sexually abused children was similar to the testimony at issue in *Favoccia*. The defendant specifically claims, as he did in his motion for a new trial, that Montelli's description of the general characteristics of abused children was based on her knowledge of C's allegations, thereby improperly linking the two and, in effect, vouching for C's credibility. The defendant thus claims that Montelli's general testimony directly or indirectly supported C's allegations that he was sexually abused by suggesting that (1) he delayed disclosure because of his close family relationship with his cousin, his lack of a strong maternal bond and his lack of knowledge that the touching was wrong, (2) he disclosed the abuse only after being threatened, and (3) he could not describe or distinguish specific incidents or say how often the abuse occurred because children similar in age have a poor concept of time and an inability to connect events and places. The state responds that the fact that Montelli testified regarding the general characteristics of abused children immediately before the video-recorded interview was shown to the jury did not result in improper vouching for C's credibility because Montelli never testified about C specifically or linked C to her other testimony about abused children generally.

We begin with the standard of review and the governing legal principles. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . .

"The determination of the credibility of a witness is solely the function of the jury. . . . It is the trier of fact which determines the credibility of witnesses and the weight to be accorded their testimony. . . . Expert witnesses cannot be permitted to invade the province of the jury by testifying as to the credibility of a particular witness or the truthfulness of a particular witness' claims. . . . An expert witness ordinarily may not

express an opinion on an ultimate issue of fact, which must be decided by the trier of fact. . . . Experts can [however] sometimes give an opinion on an ultimate issue where the trier, in order to make intelligent findings, needs expert assistance on the precise question on which it must pass. . . .

"Additionally, in cases that involve allegations of sexual abuse of children, we have held that expert testimony of reactions and behaviors common to victims of sexual abuse is admissible. . . . Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. . . . It is not permissible, however, for an expert to testify as to his opinion of whether a victim in a particular case is credible or whether a particular victim's claims are truthful. . . . In this regard, we have found expert testimony stating that a victim's behavior was generally consistent with that of a victim of sexual or physical abuse to be admissible, and have distinguished such statements from expert testimony providing an opinion as to whether a particular victim had in fact suffered sexual abuse. . . .

"Moreover, we have noted that even indirect assertions by an expert witness regarding the ultimate issue in a case can serve inappropriately to validate the truthfulness of a victim's testimony. . . . Finally, in cases in which an expert witness reaches a conclusion on the ultimate issue in part based upon statements made by the victim, we note that Connecticut case law has previously recognized the general rule of law that the expert is necessarily making a determination about the victim's credibility. . . . Such credibility determinations are more properly within the sole province of the jury." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 634–36, 881 A.2d 1005 (2005).

In *Favoccia*, this court considered "whether an expert witness' testimony that the complainant has exhibited behaviors, which were identified as those characteristic of [child] sexual assault victims, constitutes inadmissible vouching for the credibility of the complainant or opinion as to the ultimate issue of whether the complainant had been sexually assaulted"; *State* v. *Favoccia*, supra, 306 Conn. 772; and concluded that it did. Id., 772–73. In that case, the expert witness was allowed to respond to four questions posed by the prosecutor relating to whether the complainant's disclosure of abuse was accidental or purposeful, as those concepts are understood in the context of sexual abuse; id., 782–83; whether the complainant's disclosure fit the characteristics of a delayed disclosure by sexual abuse victims; id., 783–84; whether the complainant's respectful behavior toward the abuser was consistent with the tendency of an abused child to continue to show respect toward the abuser after the abuse has

occurred; id., 784–85; and whether the complainant fit the profile of a female abuse victim who attempts to make herself look unattractive to the abuser as a coping mechanism. Id., 785.

After considering these facts, we noted that the expert testimony at issue occupied "a delicate middle ground"; id., 790; between the type of expert testimony deemed admissible in *State* v. *Spigarolo*, 210 Conn. 359, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989), because it sought "to demonstrate or explain in general terms the behavioral characteristics of child abuse victims in disclosing alleged incidents"; id., 380; and the type of expert testimony deemed inadmissible in *State* v. *Grenier*, 257 Conn. 797, 806, 778 A.2d 159 (2001), because it improperly involved an opinion as to the complainant's credibility, and in *State* v. *Iban C.*, supra, 275 Conn. 635–36, because it improperly involved an opinion about whether the complainant had been sexually abused. See *State* v. *Favoccia*, supra, 306 Conn. 788–90. We ultimately concluded that "our concerns about indirect vouching expressed in [*Grenier*] and [*Iban C.*] require us to limit expert testimony about the behavioral characteristics of child sexual assault victims admitted under [*Spigarolo*] to that which is stated in general or hypothetical terms, and to preclude opinion testimony about whether the specific complainant has exhibited such behaviors. . . . [T]here is no material distinction between express testimony that the child has been sexually abused, and implicit testimony that outlines the unreliable behavioral reactions found with sexually abused victims, followed by a list of the complainant's own behavioral reactions, that points out that the two are consistent, and then invites the jury to add up the points to conclude that the child has been sexually abused. . . . Generalized testimony is sufficient to provide the jury with the valuable knowledge, which it is unlikely to have otherwise, specifically that [child] victims typically fail to provide complete or consistent disclosures of the alleged sexual abuse . . . . Thus, we agree with those authorities observing that more specific testimony yields returns that increase in prejudice to the defendant as they diminish in value with respect to the edification of the jury as to behaviors that might affect the complainant's credibility. . . . Accordingly, we . . . conclude that, although an expert witness may testify generally about the behavioral characteristics of child sexual assault victims, an expert witness may not opine about whether the specific complainant has exhibited such behaviors." (Citations omitted; footnotes omitted; internal quotation marks omitted.) Id., 803–805.

In the present case, Montelli's testimony bears no resemblance to the testimony at issue in *Favoccia*. After testifying about her qualifications, the work of the clinic, the purpose of forensic interviews, and the protocol she followed in conducting them, Montelli testified

regarding the general characteristics of sexually abused children, including children seven years old or younger, and the reasons why they may delay disclosure of the abuse. At no time during this portion of her testimony did she refer to C or attempt to link him in any way to her general description of children who are victims of sexual abuse. Immediately before the video recording of the forensic interview was played for the jury, she also testified briefly regarding the circumstances surrounding the interview, and, after the video recording was shown, she answered several minor questions regarding interview procedures wholly unrelated to the content of C's testimony. Furthermore, when asked directly on cross-examination if she had any personal knowledge that C had been sexually abused, Montelli testified: "My job isn't to say that allegations are true or not, or that . . . this child just told me the truth . . . . I don't make that determination." On redirect examination, Montelli again stated she had not "witness[ed] anything" with respect to C's abuse. Thereafter, during closing arguments, defense counsel contended that C did not fit the profile of a sexually abused child, and the prosecutor reminded the jury that Montelli could not testify as to whether any of the examples she had given regarding the behavioral characteristics of sexually abused children applied to C. In addition, the prosecutor advised that Montelli was not permitted to testify as to whether C was telling the truth because that determination was reserved for the jury. The prosecutor explained that Montelli's role was to describe, on the basis of her training and experience, the general characteristics of sexually abused children. In light of this record, we agree with the trial court that the difference between the testimony in this case and the improper testimony in *Favoccia* was "quite stark," because the opinion testimony in *Favoccia*, unlike the expert testimony in the present case, was given in response to specific questions regarding whether the complainant demonstrated the general characteristics of a sexually abused child.

The defendant claims that it is the substance of what is conveyed that matters, and not the use of triggering words, and that, in answering questions regarding the general behavioral characteristics of sexual abuse victims seven years of age and under, Montelli relied on specific facts and examples she had learned from her interview with C. The defendant therefore claims that Montelli's testimony improperly linked the behavior of C with that of children who are sexually abused. We disagree.

The purpose of expert testimony regarding the general characteristics of sexually abused children is to provide information that will assist the jury in evaluating the credibility of the complainant. As we stated in *Spigarolo*, this type "of expert testimony is admissible because the consequences of the unique trauma experi-

enced by [child] victims of sexual abuse are matters beyond the understanding of the average person. . . . Consequently, expert testimony . . . is of valuable assistance to the trier in assessing the . . . victim's credibility." (Citations omitted.) *State* v. *Spigarolo*, supra, 210 Conn. 378. It is thus to be expected that a complainant will demonstrate behavior similar or identical to the behavior of other children who have been sexually abused. Indeed, if that were not the case, expert testimony on the subject would have no relevance. More significantly, Montelli, unlike the expert in *Favoccia*, never drew a comparison between C and the characteristics she described as typical of child sexual abuse victims generally. Accordingly, we conclude that the defendant's claim must fail.

III

The defendant's final claim is that the trial court improperly permitted the state to offer evidence of the defendant's prior misconduct when he was thirteen years old because sexual misconduct committed by a juvenile who is under the age of fourteen cannot be indicative of a propensity to engage in aberrant and compulsive criminal sexual behavior. The defendant specifically claims that children under fourteen years of age are presumed to be incapable of committing a crime, and, therefore, in the absence of a threshold determination that he had the capacity to commit a sex offense when he was thirteen years old, the state was barred by the incapacity or infancy doctrine from using prior sexual misconduct evidence to show propensity and to prove that he committed sexual abuse after his fourteenth birthday. The state responds that the trial court did not admit the prior misconduct evidence to show propensity and that the defendant did not properly preserve his claim because there is no indication in the record that defense counsel objected to admission of the testimony on propensity grounds. Moreover, even if defense counsel did object on those grounds, the state argues that the claim fails on the merits. We agree with the state that the defendant's claim is unpreserved.

The following additional facts are relevant to our resolution of this claim. Prior to commencement of the trial, an on-the-record conversation occurred between the parties and the court referring to a lengthy meeting held in chambers the previous day to discuss several pending issues. According to the court, the prosecutor indicated during the meeting that he had changed the date in the information indicating when the defendant allegedly began to sexually abuse C from a few months before the defendant's fourteenth birthday to the day after his fourteenth birthday because he could not be charged as a juvenile for sexual misconduct he committed before the age of fourteen. The court also stated for the record that the prosecutor had requested permission to introduce C's testimony regarding incidents of

sexual abuse committed before the defendant's fourteenth birthday and that defense counsel had objected to admission of this testimony. The court then announced that it had decided to overrule defense counsel's objection.

The court explained: "The case law does permit, in these circumstances involving the same victim, and I think particularly in cases of this nature, where the cutoff date is so artificial, [C] . . . to describe acts that took place before the defendant's fourteenth birthday. I'm going to permit that, although I have told the state . . . and the defense that I will be instructing the jury that they must find [that the charged] conduct took place after the date alleged in the information. And . . . that's a date certain. If . . . the jury cannot find, beyond a reasonable doubt, that any misconduct occurred after July, 2007, then the defendant would have to be found not guilty." The court did not explain the evidentiary basis on which the prosecutor had relied in seeking to introduce this testimony, nor did it refer to the reasons that defense counsel had given for objecting to the testimony.

At the start of trial, the court informed the jury that the state was alleging that the defendant had committed the charged offenses "between the period of July 17, 2007, and the month of February, 2009, at various locations . . . ." In accordance with the court's pretrial decision, however, C testified, without objection by defense counsel, that he had been sexually abused by the defendant in the spring of 2007 before the defendant's fourteenth birthday in July, 2007. To prevent any possible confusion due to this discrepancy, the prosecutor later explained during closing arguments that, although the abuse had begun before the date indicated in the information, C's testimony regarding the prior abuse "gives you the whole picture, when it happened, more importantly, how . . . it started. And it also explains the arbitrary [start date of] July 17" contained in the information. In his closing argument, defense counsel also referred to the prior misconduct testimony when he twice described the defendant as a "thirteen year old, fourteen year old boy at the time . . . ."

Thereafter, the trial court gave the jury a limiting instruction regarding the proper use of the prior sexual misconduct evidence. The court first advised that, to the extent the jurors might wonder why the information indicated that the sexual abuse began on July 17, 2007, the law provides that the "conduct of a person can constitute a crime only if it is committed after the person reaches the age of fourteen." The court then continued: "So, in this case, you may recall, the parties stipulated that the defendant was born on July 16, 1993. He therefore attained the age of fourteen on July 16, 2007. As a result, the state is only permitted to prosecute

the defendant for allegations after that date. That is why the period alleged in the information starts on July 17, 2007, because it is the first full day after the defendant turned fourteen.

"Now, it is true, during the course of the trial, you may recall, that [C] testified [as] to certain behavior of the defendant that is alleged to have occurred in the months before July 17, 2007. And you were allowed to hear that testimony concerning pre-July 17, 2007 behavior so you could learn of the entirety of the sequence of events that [C] claims occurred.

"However, insofar as your verdict in this case is concerned, pre-July 17, 2007 conduct cannot be the basis of a guilty verdict. Rather, as I said earlier, in order for the state to prove any of the charges in this case, the state must prove beyond a reasonable doubt that at least one act that constitutes a crime was committed by the defendant on or after July 17, 2007.

"Now, if you find, based on the evidence, that the defendant did engage in prohibited behavior after July 17, 2007, and also before that date, then the defendant would be guilty based on the post-July 17, 2007 conduct. However, if you do not find that the state has proven beyond a reasonable doubt that at least one act constituting a crime was committed on or after July 17, 2007, then your verdict on that charge must be not guilty.

"In sum, therefore, while you are entitled to consider the evidence presented concerning the pre-July 17, 2007 behavior in order better to understand the events that are alleged to have occurred, your verdict as to each charge must be based solely upon conduct you find to have occurred within the specific time period in the information."

We first set forth the legal principles that govern our resolution of preservation claims. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush. . . . Thus, because the sina qua non of preservation is fair

notice to the trial court . . . the determination of whether a claim has been properly preserved will depend on a careful review of the record to ascertain whether the claim on appeal was articulated below with sufficient clarity to place the trial court on reasonable notice of that very same claim." (Citations omitted; internal quotation marks omitted.) *State* v. *Jorge P.*, 308 Conn. 740, 753–54, 66 A.3d 869 (2013).

In the present case, the meeting in which the prosecutor requested permission to present the prior misconduct testimony was held in chambers, and the court's on-the-record description of the meeting the following day contains no information regarding the basis for the prosecutor's request or for defense counsel's objection. Moreover, when the court explained its reasons for overruling the objection, it provided no legal authority in support of its ruling. It merely stated: "The case law does permit, in these circumstances involving the same victim, and I think particularly in cases of this nature, where the cutoff date is so artificial, [C] . . . to describe acts that took place before the defendant's fourteenth birthday." At that point, defense counsel could have articulated the basis for his objection on the record, but he failed to do so. Defense counsel also made no further objection to the prior misconduct testimony when C testified at trial. In fact, defense counsel referred to the defendant on two occasions during his closing argument as a thirteen and fourteen year old boy when the misconduct occurred. Accordingly, our careful review of the record indicates that counsel failed to articulate a basis for his objection to the prior misconduct evidence with "sufficient clarity to place the trial court on reasonable notice of that very same claim." *State* v. *Jorge P.*, supra, 308 Conn. 754.

Moreover, our review of the record indicates that the prior misconduct testimony was not admitted to show propensity but to assist the jury in understanding the meaning of the dates in the information defining the period of time during which the alleged abuse took place. See, e.g., *State* v. *Ali*, 233 Conn. 403, 427, 660 A.2d 337 (1995) ("[prior] misconduct evidence may be used to complete the story of the charged crime by placing it in the context of nearby and nearly contemporaneous happenings" [internal quotation marks omitted]). The prosecutor contended in his closing argument that the prior misconduct testimony gave the jury "the whole picture, when it happened, more importantly, how . . . it started. And it also explains the arbitrary [start date of] July 17" contained in the information. The trial court likewise noted in its final jury instructions that the prior misconduct testimony would allow the jury to "learn of the entirety of the sequence of events that [C] claims occurred." The court later added: "[W]hile you are entitled to consider the evidence presented concerning the pre-July 17, 2007 behavior in order better to understand the events that are alleged

to have occurred, your verdict as to each charge must be based solely upon conduct you find to have occurred within the specific time period in the information." It is thus apparent that the trial court admitted the prior misconduct testimony to complete the story of why the state had alleged July 17, 2007, as the date when the crimes began, and not to show the defendant's general propensity to commit sexual abuse, including his alleged abuse of C.

Because there is nothing in the record to indicate the basis for defense counsel's objection to admission of the challenged testimony, there is no way of knowing whether the trial court considered and rejected an argument by the defense that the testimony was inadmissible on propensity grounds, as the defendant argues on appeal. If defense counsel did not object to admission of the evidence on propensity grounds, the defendant cannot ask this court to review the trial court's decision on those grounds, because such a review would result in trial by ambuscade. See, e.g., *Ferraro* v. *Ridgefield European Motors, Inc.*, 313 Conn. 735, 759, 99 A.3d 1114 (2014) ("[f]or us [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge" [internal quotation marks omitted]). If defense counsel did object on those grounds, he could have explained his reasoning at several points during the proceeding, including when the trial court initially overruled his objection before trial and when C testified. Because he failed to do so, this court has no authority to review the defendant's claim because it is unpreserved.[9]

The judgments are affirmed.

In this opinion ROGERS, C. J., and PALMER, McDONALD, ESPINOSA and ROBINSON, Js., concurred.

* In accordance with our policy of protecting the privacy interests of victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] General Statutes § 53a-70 (b) (3) provides: "Any person found guilty under this section shall be sentenced to a term of imprisonment and a period of special parole pursuant to subsection (b) of section 53a-28 which together constitute a sentence of at least ten years."

[2] General Statutes (Rev. to 2007) § 53-21 (a), as amended by Public Acts 2007, No. 07-143, § 4, provides in relevant part: "[I]f the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

[3] We note that the sexual abuse that formed the basis for the defendant's convictions occurred over a span of time during which the defendant was either fourteen or fifteen years old. For purposes of our analysis, we refer to the defendant as fourteen and fifteen years old.

[4] The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

The cruel and unusual punishments clause of the eighth amendment is made applicable to the states through the due process clause of the fourteenth amendment. E.g., *Tuilaepa* v. *California*, 512 U.S. 967, 970, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994).

[5] General Statutes § 46b-127 (a) (1) provides in relevant part: "The court shall automatically transfer from the docket for juvenile matters to the regular criminal docket of the Superior Court the case of any child charged with the commission of . . . a class A or B felony . . . provided such offense was committed after such child attained the age of fourteen years and counsel has been appointed for such child if such child is indigent. . . ."

Although § 46b-127 has been the subject of several amendments since the alleged crimes in the present case occurred, those amendments have no bearing on the merits of this appeal. For convenience, we refer to the current revision of § 46b-127.

[6] As we note subsequently in this opinion, the trial court sentenced the defendant to mandatory terms of incarceration for both the first degree sexual assault and risk of injury counts but ordered that they be served concurrently.

[7] The term "juvenile offenders" refers in all three cases to offenders who were under the age of eighteen when they committed their crimes.

[8] Justice Eveleigh's lengthy analysis of the constitutionality of mandatory minimum sentences for juvenile offenders is deeply flawed. Among other things, Justice Eveleigh improperly (1) construes *Roper*, *Graham* and *Miller* as requiring "individualized, fully discretionary sentencing" for all juvenile offenders, "including the ability to depart downward from a mandatory minimum sentence," (2) relies on a recent Iowa case in which the court concluded that mandatory minimum sentences for juvenile offenders are impermissible under the *Iowa constitution*; see *State* v. *Lyle*, 854 N.W.2d 378, 400 (Iowa 2014); and (3) attributes views and conclusions to the majority that find no support in this opinion. We discuss each of these flaws in turn.

We begin with Justice Eveleigh's repeated claim that *Roper*, *Graham* and *Miller* require "individualized, fully discretionary sentencing" for all juvenile offenders because *Miller* allegedly suggests that "neither the crime *nor its mandatory minimum punishment* should be a factor in a sentencing court's ability to comply with the eighth amendment to the United States constitution . . . ." (Emphasis added.) The language in *Miller* on which Justice Eveleigh relies provides that "[n]one of what [*Roper* and *Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime specific." *Miller* v. *Alabama*, supra, 132 S. Ct. 2465. Justice Eveleigh's broad interpretation of this language, however, is unsupportable. The full passage from which it is taken provides: "*Graham*'s flat ban on life without parole applied only to nonhomicide crimes, and the [c]ourt took care to distinguish those offenses from murder, based on both moral culpability and consequential harm. . . . But none of what it said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific. *Those features are evident in the same way, and to the same degree, when (as in [Miller]) a botched robbery turns into a killing*. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." (Citation omitted; emphasis added.) Id. From this more complete rendition of the passage, it is clear that the court in *Miller* was referring only to the fact that *Graham*'s reasoning regarding a sentence of life without the possibility of parole applied equally to both homicide and nonhomicide offenses committed by juvenile offenders. There is nothing in the passage suggesting that the court was also referring to less severe punishments or that trial courts should have unfettered discretion in sentencing juvenile offenders. Accordingly, to the extent Justice Eveleigh adopts a far more expansive interpretation of *Miller*, it is utterly lacking in support, and all other conclusions that flow from his interpretation are also lacking in support.

Second, although Justice Eveleigh relies extensively on a recent Iowa Supreme Court decision holding that mandatory minimum sentences for juvenile offenders are impermissible, he omits the fact that the Iowa court chose *not* to decide the defendant's claim in that case under federal law, as the defendant originally argued, but, rather, under the Iowa constitution after requesting additional briefing from the parties on that issue. See *State* v. *Lyle*, supra, 854 N.W.2d 380, 382. Justice Eveleigh also omits the fact that, in interpreting the Iowa constitution, the Iowa Supreme Court relied in part on the state legislature's decision in 2013 to expand the discretion of state courts in juvenile matters by amending Iowa's sentencing statutes to remove mandatory sentencing for juveniles in most cases; id., 387–88; on other provisions in the Iowa criminal statutes vesting considerable discretion in courts when deciding juvenile matters; id., 388; and on a trilogy of recent juvenile cases decided by the court under the Iowa constitution. Id., 395. Finally, Justice Eveleigh omits the fact that the Iowa court recognized that "*no other court in the nation* has held that its constitution or the [f]ederal [c]onstitution prohibits a statutory schema that prescribes a mandatory

minimum sentence for a juvenile offender"; (emphasis added) id., 386; and that "no . . . national consensus exists against the imposition of mandatory sentences on juvenile offenders; the practice is common across jurisdictions." (Internal quotation marks omitted.) Id., 387, quoting A. Dutton, comment, "The Next Frontier of Juvenile Sentencing Reform: Enforcing *Miller*'s Individualized Sentencing Requirement Beyond the JLWOP Context," 23 Temp. Pol. & Civ. Rts. L. Rev. 173, 195 (2013). Justice Eveleigh thus ignores key aspects of the Iowa court's analysis that render its decision inapplicable in resolving the defendant's claim in the present case that his mandatory minimum sentences were unconstitutional under federal law.

Third, Justice Eveleigh overlooks the fact that the defendant seeks review of his sentences only under *Roper*, *Graham* and *Miller*, and, therefore, Justice Eveleigh improperly castigates the majority for failing to consider unrelated factors that have no bearing on the limited issue before this court. For example, Justice Eveleigh suggests that the majority should have applied *Alleyne* v. *United States*,      U.S.    , 133 S. Ct. 2151, 2160, 186 L. Ed. 2d 314 (2013), a sixth amendment case in which the United States Supreme Court determined, according to Justice Eveleigh, that "the floor of a sentencing range mattered just as much to the defendant as the ceiling in giving effect to the protections afforded by the constitution," even though that case has no relevance in this eighth amendment appeal involving juvenile sentencing. Similarly, in claiming that the majority should have compared the severity of the sentences in the present case with the sentences for other crimes within this and other jurisdictions, and should have considered objective indicia of society's standards, as expressed in legislative enactments and state practice, Justice Eveleigh would have this court go far beyond the defendant's limited claim that his mandatory minimum sentences are unconstitutional under *Roper*, *Graham* and *Miller*.

Justice Eveleigh also greatly simplifies and misconstrues our analysis when he suggests that the majority believes that the "dispositive" factor under the three United States Supreme Court cases is the severity of the punishment and that the rationales of those cases apply with less force when the sentence imposed is not death or life imprisonment without the possibility of parole. Contrary to Justice Eveleigh's view, the majority does not believe that the severity of the punishment is the dispositive factor under the three Supreme Court cases but that it is an important factor in understanding the extent to which the holdings in those cases apply to this court's analysis of the mandatory minimum sentences in the defendant's case. The majority also does not believe that the three cases apply with less force when the sentence is not one of the two most extreme punishments available to the court. The principle of proportionality that lies at the heart of the three Supreme Court cases applies with equal force to all sentencing decisions. Because the severity of the sentences was an important consideration in the three Supreme Court cases, however, this court is not required to reach the same conclusion regarding the proportionality of the defendant's far more lenient sentence in the present case.

[9] We also reject the defendant's claim that the trial court committed plain error in admitting the prior misconduct testimony to show propensity. "[The plain error] doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly." (Internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 76–77, 60 A.3d 271 (2013).

In the present case, there is nothing in the record to indicate that the trial court admitted testimony regarding the defendant's prior misconduct to demonstrate propensity, just as there is nothing in the record to indicate that defense counsel objected to admission of the testimony on that ground. Rather, the record indicates that the trial court admitted the testimony to complete the story of why the state had charged the defendant with criminal conduct that began on the day after his fourteenth birthday. We therefore conclude that there is no basis for the defendant's claim that the trial court committed plain error in admitting the testimony to show the defendant's propensity.